LOUIS A. TAUBE AND ZOE TAUBE, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

WILLIAM C. STAIB AND ANN P. STAIB, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 13922-83,[1] 13992-83.     Filed February 26, 1987.

---

[16]See *Oden v. Commissioner*, T.C. Memo. 1981-184, affd. without published opinion 679 F.2d 885 (4th Cir. 1982).

[1]Pursuant to a motion granted May 20, 1985, these cases were consolidated for the purposes of trial, briefing, and opinion.

*Larry Kars*, for the petitioners.
*John E. Becker, Jr.*, for the respondent.

TANNENWALD, *Judge*: Respondent determined the following deficiencies in petitioners' Federal income taxes for the year 1979:

| Docket No. | Deficiency |
| --- | --- |
| 13922-83 | $7,654 |
| 13992-83 | [2]3,313 |

After concessions, we must determine whether Andrama I Partners, Ltd., a limited partnership, was entitled to various deductions and an investment tax credit with respect to its purchase and distribution of nursing training films and, in turn, whether petitioners were entitled to their distributive shares of such deductions and credit.

### FINDINGS OF FACT

Some of the facts have been stipulated and are so found. This reference incorporates the stipulations · of facts and attached exhibits.

Petitioners Louis A. Taube and Zoe Taube resided in Bayside, New York, at the time they filed their petition in this case. They timely filed joint Federal income tax returns for the year 1979. Petitioners William C. Staib and Ann P. Staib resided in Scarsdale, New York, at the time they filed their petition in this case. They timely filed joint Federal income tax returns for the year 1979.

Andrama I Partners, Ltd. (Andrama I), is a New York limited partnership which was formed on June 18, 1979. Andrama I has one general partner, Herbert M. Kuschner (Kuschner), who was its organizer, and 21 limited partners, 2 of whom are petitioners Louis A. Taube (Taube) and William C. Staib (Staib). The limited partners were allocated

---

[2]In the statutory notice, dated Apr. 14, 1983, respondent determined a deficiency of only $2,538. In an amended answer, dated Aug. 5, 1985, respondent determined an additional deficiency in the amount of $775 for petitioners' claimed investment tax credit.

99 .percent of the income, deductions, losses, and credits of the partnership under the terms of the limited partnership agreement, while Kuschner was allocated 1 percent of such items.

On July 25, 1979, petitioners Taube and Staib (hereinafter sometimes referred to as petitioners) executed subscription agreements and promissory notes whereby they agreed to invest $15,900 and $5,300 in Andrama I, respectively. During 1980, petitioners paid off the principal amount of each of their notes, plus interest. The other limited partners contributed $137,800 in cash to Andrama I, for total limited partners' contributions of $159,000.[3] Kuschner invested $1,000 in Andrama I, bringing total partner contributions to $160,000. As specified in the limited partnership agreement, Kuschner received a guaranteed fee of $15,000 from Andrama I in return for his services in organizing the partnership. This fee was paid in 1980 and deducted on the 1980 partnership return and is not at issue herein.

Kuschner was also the tax advisor to Intergroup Productions, Inc. (Intergroup), a New York corporation which made a series of 16mm films entitled "Management Skills for Nurses" in 1979. These films were later converted into a series of videotapes by ABC Video Enterprises, Inc., a subsidiary of American Broadcasting Co.'s, Inc. (ABC),[4] whom Andrama I licensed to distribute the films on July 18, 1980. The first two films in this series are entitled "Moving Up: Making the Transition to Head Nurse" (Moving Up) and "Planning: Preparing for Action" (Planning), and are the subject of the instant litigation.[5] The films were made by Intergroup for Andrama Films, Ltd. (Andrama Films), another New York corporation.

Rudolph Gartzman (Gartzman) is the president and 100-percent stockholder of Intergroup and was the writer, director, and producer of the "Management Skills for

---

[3]The private placement memorandum issued with respect to Andrama I provided for the sale to the limited partner investors of 60 units in the partnership at $2,650 per unit. Petitioner Taube acquired 6 units and petitioner Staib acquired 2 units.

[4]Hereinafter, we will refer to ABC and its subsidiaries simply as ABC.

[5]The original plan called for the filming of a total of 10 films for the series. However, only 3 films were actually completed. The third film, entitled "Organizing: Making It All Happen," is not before the Court in the instant cases.

Nurses" film series.[6] Gartzman was introduced to Kuschner by a mutual acquaintance, Ira Victor, who had held posts over the years as the Director of Training at Citibank, N.A. and Kings County Medical Center, and who had a considerable amount of training in the hospital nursing field. During the year in issue, Gartzman was a 50-percent stockholder and the president of Andrama Films. Jacqueline Salat (Salat) owned the remaining 50-percent interest in Andrama Films.

On June 18, 1979, Andrama Films executed a memorandum of agreement (purchase agreement) with Andrama I, under which Andrama I agreed to pay Andrama Films $750,000 for "all right, title and interest" in "Moving Up" and "Planning" (hereinafter sometimes referred to as the films). The $750,000 purchase price was payable as follows: $150,000 cash principal; $5,000 cash interest; and $600,000 by a recourse promissory note with 9 percent interest due on October 1, 1987. The purchase agreement also required that each investor in Andrama I be personally liable for a percentage of the recourse note equal to his share in the partnership.

Accordingly, on June 18, 1979, Andrama I executed the above mentioned $600,000 recourse promissory note naming Andrama Films as payee. Under the terms of the note, 80 percent of all revenues generated from the distribution of the films (i.e., received by Andrama I) is to be applied to paying off the note plus accrued interest.[7] In the event such revenues are not generated, the payment of principal and accrued interest will still be due and payable on October 1, 1987. If such principal and interest are not paid on October 1, 1987, the films revert back to Andrama Films and the partners of Andrama I shall be personally liable for the

---

[6]Gartzman was an experienced producer and director of industrial, documentary, and training films. As president of Intergroup, which was founded in 1970, Gartzman had created films and videotapes for numerous clients, including the U.S. Government, AT&T, Citibank, Mobil Oil, Metropolitan Life, and Fiat Motors, and his work had won three Gold Awards at the International Film and T.V. Festival of New York.

[7]A supplemental agreement entered into between Kuschner, Gartzman, and Salat on Nov. 19, 1981, provides that "Once the total receipts of Andrama Films, Ltd. exceed the sum of the [recourse promissory note] and the total amount of initial funding provided by [Andrama I], then all further receipts shall go to [Andrama I]."

principal balance (i.e., face amount) of the note, but not for accrued, but unpaid interest.[8]

In accordance with the requirements set forth in the purchase agreement and the recourse note, the subscription agreement signed by each investor in Andrama I required that each prospective partner also execute an assumption agreement making him personally liable on that part of the principal balance of the recourse note proportionate to his share in the partnership.[9] Petitioners Taube and Staib each executed a subscription and an assumption agreement. The assumption agreement provides that each limited partner has a primary obligation, with no right of indemnification or contribution from, or any right of subrogation against, the partnership or general partner and that benefit of the assumption agreement accrues to the obligee of the recourse promissory note, who is entitled to proceed directly against the assuming partner.

Prior to agreeing to make their investment in Andrama I, each of the petitioners had been furnished with a copy of a private placement memorandum dated June 1, 1979. At the outset, the private placement memorandum set forth the following as "SUITABILITY STANDARDS FOR INVESTORS":

Because of the relative lack of liquidity of Interests and the fact that the relative financial benefit of an investment in the Partnership will generally depend substantially on the tax bracket of the investor, Interests being offered pursuant to this Private Placement Memorandum will be sold only to an investor who represents that he has a net worth (excluding home, home furnishings and automobiles) of at least $150,000, and estimates that (without regard to an investment in the Partnership) he will have some income during the current year, and the next succeeding year, taxable in a Federal Income Tax bracket higher than 50%, or in the case of corporate investors, taxable at the maximum regular corporate rate. The General Partner believes that these standards will help insure that the Interests will be sold only to investors who can best utilize the benefits offered by, and bear the risks of, the investment.

---

[8] The purchase agreement and the subscription agreement simply refer to the personal liability of each partner for his percentage of the note, but the promissory note and the implementing assumption agreement limit the liability to the percentage of the unpaid principal amount of the note.

[9] Each assumption agreement provides for a "maximum principal payment liability" of $9,900 per partnership interest, which would result in a maximum indemnification by the limited partners of $594,000 (60 interests × $9,900), or 99 percent of the face value of the recourse note.

The private placement memorandum then went on to detail the financial terms of the arrangements (including the formation of the partnership, the purchase price to be paid for the films, the agreements each investor would be required to sign, the risk factors, the possible conflict of interest because Kuschner, the general partner, was the accountant and advisor to many of the investors and was also the tax advisor to Intergroup), and a detailed analysis of the tax implications for an investor. In addition, the private placement memorandum provided that Andrama I expected to engage ABC's services and enter into an agreement under which ABC would receive 35 percent of the gross revenues collected from the world-wide sale or rental of the films,[10] as a distribution fee, with Andrama I receiving the remaining 65 percent.[11] Finally, the private placement memorandum then set forth a pro-forma income and cash-flow statement which projected net income before taxes and cash-flow available for distribution as shown on page 470.

These projections, which were prepared by Kuschner, were based upon his discussions with Xicom, another distribution company, and not ABC. Although the calculations assumed total sales of 2,500 sets of films (two films to a set) and an average sale price per set of $800 ($400 per film), which resulted in revenue estimates which were not out of line with those made by ABC (see p. 473 *infra*), they incorrectly assumed that Andrama I would be entitled to *80 percent* of gross revenues, after recoupment by the distributor of certain up-front distribution costs estimated at $30,000. Given the fact that Kuschner, at the time of the offering, expected to consummate the distribution arrangement with ABC, and not Xicom, the reconstructed table on page 471 represents comparable calculations assuming receipt by Andrama I of only a *65-percent* share of gross revenues, as provided for under the contemplated ABC

[10]Hereinafter, unless otherwise indicated, any reference to the "films" means both 16mm films and videotapes.

[11]Prior to the issuance of the private placement memorandum, Kuschner had begun discussions with distribution companies, including ABC, concerning the distribution of the "Management Skills for Nurses" film series.

## ANDRAMA I PARTNERS, LTD.
### PROFORMA INCOME AND CASH-FLOW STATEMENT

| | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | Total |
|---|---|---|---|---|---|---|---|
| INCOME: | $780 | $27,300 | $218,400 | $585,000 | $449,800 | $278,720 | $1,560,000 |
| Less: Distribution costs | (780) | (27,300) | (1,920) | --- | --- | --- | (30,000) |
| EXPENSES: | | | | | | | |
| Depreciation | 100,000 | 260,000 | 156,000 | 93,600 | 84,436 | 55,964 | 750,000 |
| Interest | 33,000 | 66,000 | 66,000 | 61,437 | 26,256 | --- | 252,693 |
| Organizational fees | 2,500 | 5,000 | 5,000 | 5,000 | 5,000 | 2,500 | 25,000 |
| Accounting and legal | 10,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,500 |
| Total expenses | 145,500 | 333,500 | 229,500 | 162,537 | 118,192 | 60,964 | 1,050,193 |
| NET PROFIT (Loss) | (145,500) | (333,500) | (13,020) | 422,463 | 331,608 | 217,756 | 479,807 |
| Investment credit (X2) | (46,952) | --- | --- | --- | --- | --- | (46,952) |
| TAXABLE PROFIT (Loss) | (192,452) | (333,500) | (13,020) | 422,463 | 331,608 | 217,756 | 432,855 |
| Amount per unit | (3,208) | (5,558) | (217) | 7,041 | 5,527 | 3,629 | 7,214 |
| Two unit minimum | (6,415) | (11,117) | (434) | 14,082 | 11,054 | 7,259 | 14,429 |
| CASH-FLOW: | | | | | | | |
| Profit (loss) per above | (145,500) | (333,500) | (13,020) | 422,463 | 331,608 | 217,756 | 479,807 |
| Add: Depreciation and amortization | 102,500 | 265,000 | 161,000 | 98,600 | 89,436 | 58,464 | 775,000 |
| Expenses accrued but not paid | 38,000 | 68,500 | 66,000 | --- | --- | --- | 172,500 |
| Deduct downpayment | (109,000) | --- | --- | --- | --- | --- | (109,000) |
| Organization costs | (25,000) | --- | --- | --- | --- | --- | (25,000) |
| Working capital reserve | (20,000) | --- | --- | --- | --- | --- | (20,000) |
| Partners' capital | 159,000 | --- | --- | --- | --- | --- | 159,000 |
| Cash-flow from operations | --- | --- | 213,980 | 521,063 | 421,044 | 276,220 | 1,432,307 |
| Loan payments | --- | --- | 41,480 | 309,831 | 248,689 | --- | 600,000 |
| Payment of prior years accrued [expenses] | --- | --- | 172,500 | --- | --- | --- | 172,500 |
| Cash available for distribution | --- | --- | --- | 211,232 | 172,355 | 276,220 | 659,807 |

## ANDRAMA I PARTNERS, LTD.
### PROFORMA INCOME AND CASH-FLOW STATEMENT

| | 1979 | 1980 | 1981 | 1982 | 1983 | 1984 | Total |
|---|---|---|---|---|---|---|---|
| INCOME: | $780 | $22,181 | $177,450 | $475,312 | $365,463 | $226,460 | $1,267,646 |
| Less: | | | | | | | |
| Distribution costs | (780) | --- | --- | --- | --- | --- | [1](780) |
| EXPENSES: | | | | | | | |
| Depreciation | 100,000 | 260,000 | 156,000 | 93,600 | 84,436 | 55,964 | 750,000 |
| Interest | 33,000 | 66,000 | 66,000 | 61,437 | 26,256 | --- | 252,693 |
| Organizational fees | 2,500 | 5,000 | 5,000 | 5,000 | 5,000 | 2,500 | 25,000 |
| Accounting and legal | 10,000 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 22,500 |
| Total expenses | 145,500 | 333,500 | 229,500 | 162,537 | 118,192 | 60,964 | 1,050,193 |
| NET PROFIT (Loss) | (145,500) | (311,319) | (52,050) | 312,775 | 247,271 | 165,496 | 216,673 |
| Investment credit (X2) | (46,952) | --- | --- | --- | --- | --- | (46,952) |
| TAXABLE PROFIT (Loss) | (192,452) | (311,319) | (52,050) | 312,775 | 247,271 | 165,496 | 169,721 |
| Amount per unit | (3,208) | (5,189) | (867) | 5,213 | 4,121 | 2,758 | 2,829 |
| Two unit minimum | (6,415) | (10,377) | (1,735) | 10,426 | 8,242 | 5,517 | 5,657 |
| CASH-FLOW: | | | | | | | |
| Profit (loss) per above | (145,500) | (311,319) | (52,050) | 312,775 | 247,271 | 165,496 | 216,673 |
| Add: Depreciation and amortization | 102,500 | 265,000 | 161,000 | 98,600 | 89,436 | 58,464 | 775,000 |
| Expenses accrued but not paid | 38,000 | 68,500 | 66,000 | --- | --- | --- | 172,500 |
| Deduct downpayment | (109,000) | --- | --- | --- | --- | --- | (109,000) |
| Organization costs | (25,000) | --- | --- | --- | --- | --- | (25,000) |
| Working capital reserve | (20,000) | --- | --- | --- | --- | --- | (20,000) |
| Partners' capital | 159,000 | --- | --- | --- | --- | --- | 159,000 |
| Cash-flow from operations | --- | 22,181 | 174,950 | 411,375 | 336,707 | 223,960 | 1,169,173 |
| Loan payments | --- | --- | 24,631 | 326,680 | 248,689 | --- | 600,000 |
| Payment of prior years accrued [expenses] | --- | --- | 150,319 | 22,181 | --- | --- | 172,500 |
| Cash available for distribution | --- | 22,181 | --- | 62,514 | 88,018 | 223,960 | 396,673 |

[1]The $780 in distribution costs which we have accounted for were personally incurred by Mr. Kuschner prior to ABC's involvement. See note 14 infra.

agreement and as described in the private placement memorandum.[12]

In a tentative agreement, dated October 10, 1979, which formed the basis for the actual licensing agreement signed on July 18, 1980, ABC agreed in principle to the 35-percent distribution fee referred to in the private placement memorandum. Moreover, in a letter dated February 14, 1980, from ABC to Kuschner and Gartzman, ABC reconfirmed the 35-percent distribution fee but indicated that despite the possibility of a contrary interpretation (which Andrama I seemingly understood was correct) of the October 10, 1979, letter, ABC intended that out-of-pocket distribution costs were to be reimbursed to ABC in addition to that fee.[13]

Finally, on July 18, 1980, Andrama I executed a licensing agreement with ABC. The licensing agreement gave ABC the exclusive right to distribute the films throughout the world for 3 years, with a negotiable 2-year option, and then with renewable 5-year options. Under this final agreement, however, ABC was to receive, as distribution fees, 70 percent of the gross receipts from sales or rentals of the films out of which it would pay distribution costs. Andrama I was to receive the remaining 30 percent of the gross receipts, which was to be allocated as follows: 80 percent to pay off the $600,000 recourse note to Andrama Films; 10 percent to operating capital; and 10 percent to be distributed to the partners. See also note 7 *supra*.

Due to the large turnover in management personnel in nursing institutions, as well as the fact that overall expenditures for health care in the United States were approaching 10 percent of the gross national product in 1979, ABC felt that the market for nursing training films constituted a growth area. ABC's market research suggested that the universe of potential users who might purchase the

---

[12]Moreover, it also appears that Kuschner, and therefore Andrama I, expected that, under the arrangement with ABC, the latter would bear the distribution costs out of its 35-percent share of the gross revenues. See text above. Accordingly, unlike as was done in the Xicom projections (see p. 470 *supra*), we have not deducted from Andrama I's 65-percent profit share the $30,000 in distribution costs described above.

[13]Peter Schillaci (Schillaci) was the director of ABC's Wide World of Learning, a subdivision of ABC Video and was in charge of the distribution of the films, having initially become involved in the project sometime in the fall of 1979. He explained at trial that the earlier figure was renegotiated because it was "totally unprecedented * * *. There would be nothing in [the] operating plan that would justify that kind of split. The traditional split was I think the one we ended up with."

films was approximately 20,000 to 25,000 institutions. ABC had projected that, over a 3 to 5 year period and under a best case scenario, 3,000 sets of films would be sold, and under a worst case scenario, 1,000 sets would be sold, at an average price of $350 per film or $700 per set. Thus, ABC expected its distribution efforts to generate anywhere from $700,000 to $2,100,000 in gross receipts from institutional sales. Moreover, beyond this 5-year period, ABC projected additional revenues from markets as yet undeveloped in 1979, including cable television delivery and direct video-tape sales for home study to individual nurses. With respect to these direct sales, the price of the videotapes would have had to have been substantially reduced to approximately $80 to $90 per tape, so that nurses could afford to purchase them.

Despite ABC's enthusiasm with the project and its efforts to market and distribute the films, its sales results were disastrous. As of October 1, 1983, "Moving Up" and "Planning" had generated only $24,607 and $6,776 in sales, respectively, for ABC.[14] Andrama I's share of these gross profits was only $10,720.50. Kuschner and Gartzman had been continuously dissatisfied with the sales results being achieved by ABC and felt that the films' poor showings were directly related to the methods and sales' practices employed by ABC in marketing the films.[15] Accordingly, upon the expiration of the initial 3-year licensing period, Andrama I opted not to renegotiate the licensing agreement.

Instead, Kuschner and Gartzman had taken steps to seek out a new distribution company whose thinking was more in line with theirs,[16] and on April 1, 1983, Andrama I executed an audio-visual distribution agreement with the American

[14]During the taxable year 1979, prior to ABC's involvement, the films' gross earnings were only $780, which was completely offset by the cost of prints of the films. These sales were made by Mr. Kuschner personally.

[15]From the outset, Kuschner, and especially Gartzman, actively oversaw ABC's handling of the films and made numerous suggestions to Schillaci, most of which were never implemented, on how ABC could better market the films.

[16]The supplemental agreement, dated Nov. 19, 1981 (see note 7 *supra*), also provided that Andrama I could not modify its relationship with ABC or any other distributor without the express written consent of Gartzman. Furthermore, the agreement provided that Kuschner was to instruct ABC and any other distributors to send all distribution payments directly to Andrama Films, payee. Gratzman was required to send Kuschner a photocopy of each payment statement within 10 days of its receipt from ABC.

Journal of Nursing Co. (AJNC),[17] a New York for-profit corporation affiliated with the American Nursing Association, a non-profit organization, under which the AJNC was given the exclusive right to distribute the films in the United States and Mexico, and the nonexclusive right to distribute the films in the rest of the world, for the full term of the copyright, subject to termination by either party after 2 years, or yearly, thereafter, upon prior written notice. Under the distribution agreement, the AJNC was to receive, as distribution fees, 65 percent of the net revenues from the sales or rentals of videotapes and 75 percent of the net revenues from the sales or rentals of 16mm films, with Andrama I receiving the remaining 35 percent and 25 percent of net revenues, respectively.

Andrama I claimed on a schedule attached to its 1979 partnership return that the U.S. production costs for the two films was $352,125. The cash out-of-pocket production costs, which were paid for "Moving Up" and "Planning," were $89,111.19 and $49,960.11, respectively (total $139,071.30). Deferred production costs for "Moving Up" and "Planning," which were not paid in 1979 and which included fees for writer, director, producer, and executive producer, were $73,388.81 and $100,539.89, respectively (total $173,928.70). Participations and residuals for both films, which were deferred and not paid in 1979, totaled $39,125.[18]

## OPINION

The specific issues for decision are whether (1) Andrama I purchased an ownership interest in the films; (2) Andrama I entered into the transaction with a bona fide objective to make a profit; (3) the recourse promissory note constituted a genuine indebtedness fully includable in determining the films' basis for depreciation; (4) Andrama I is entitled to

[17]According to the licensing agreement, the initial 3-year licensing period with ABC was officially terminated at the earliest as of July 18, 1983. We note, however, solely for clarification of the record, that Andrama I entered into its distribution agreement with the AJNC prior to this date and that ABC recorded gross sales from the films totaling $2,435 until Oct. 1, 1983.

[18]Petitioners concede that the $39,125 amount for participations and residuals should not have been included in the claimed total production costs, and accordingly, claim that their total production costs should be $313,000 for purposes of computing the investment tax credit.

deduct interest accrued, but not paid, in 1979; and (5) production expenses for purposes of computing Andrama I's investment tax credit basis include amounts incurred, but not paid, in 1979.

Respondent's initial argument is that Andrama I did not, in substance, purchase an ownership interest in the films, and thus is not entitled to the deductions which would flow from such ownership. He argues that, despite the transaction's being labeled as a sale, it was nothing more than a mere financing arrangement and that no actual purchase took place. Petitioners, on the other hand, contend that the substance of the transaction comports with its form and that the partnership did, in fact, purchase the films from Andrama Films.

It is well established that for Federal tax purposes a transaction will be governed by its substance rather than by its form. *Gregory v. Helvering*, 293 U.S. 465 (1935). Accordingly, we look "to the objective economic realities of [the] transaction rather than to the particular form the parties employed" (*Frank Lyon v. United States*, 435 U.S. 561, 573 (1978)), in order to determine whether a bona fide sale of the films was effectuated. The critical test is whether the benefits and burdens of ownership actually passed from Andrama Films to the partnership, which "is a question of fact which must be ascertained from the intention of the parties as evidenced by the written agreements read in light of the attending facts and circumstances." *Grodt & McKay Realty, Inc. v. Commissioner*, 77 T.C. 1221, 1237 (1981). See also *Leahy v. Commissioner*, 87 T.C. 56, 66-67 (1986).

A sale of a motion picture will be recognized for purposes of Federal taxation only "when there is a transfer of all substantial rights of value in the motion picture copyright." *Tolwinsky v. Commissioner*, 86 T.C. 1009, 1042 (1986). Accordingly, no sale will occur "if the transferor retains proprietary rights in the motion picture." *Tolwinsky v. Commissioner*, supra at 1043. See also *Durkin v. Commissioner*, 87 T.C. 1327 (1986); *Cory v. Commissioner*, 23 T.C. 775 (1955), affd. 230 F.2d 941 (2d Cir. 1956).

By the terms of the purchasing agreement, Andrama Films transferred "all right, title and interest" it held in the films to Andrama I. Respondent asserts, however, that this

transfer was illusory because (1) any proceeds realized from the sale or rental of the films by ABC or AJNC were to be sent directly to Andrama Films and did not pass through the partnership, and (2) Gartzman possessed veto power over any change in distributors, was the person who dealt with those distributors and, in so doing, represented the interests of his two corporations and himself and not those of Andrama I. We find respondent's arguments unconvincing.

It was not until 2 years, after the purchase agreement was originally entered into, by letter dated July 14, 1981, that Kuschner instructed ABC to send the royalty payments directly to Andrama Films, and it was even later, by virtue of the supplemental agreement dated November 19, 1981, that Kuschner agreed that Gartzman should have formal control with respect to Andrama I's distribution arrangements. See note 16 *supra*. No evidence has been presented that these modifications were ever contemplated or incorporated, by reference or otherwise, into the original purchase agreement, nor can we find, on the record before us, that such an implicit understanding existed between Gartzman and Kuschner.

By the time the arrangements to make royalty payments directly to Andrama Films became operative, revenues were lagging far behind projections and Gartzman and Kuschner made the arrangements because Gartzman "had personally received so little money [and wanted] to make sure that [he] was going to get deferred fees before anyone got anything." Moreover, although Gartzman had always played an active role in the negotiations and ongoing dealings with ABC and Schillaci, we do not think such involvement should necessarily be equated with a retention by Gartzman or Andrama Films of sufficient rights or control with respect of the films to negate Andrama I's ownership rights in the films. Rather, the only significance we attach to Gartzman's participation was that he was obviously concerned with the films' success both from a financial and reputational standpoint and sought meaningfully to participate in efforts to assure that the films were properly marketed and widely distributed. We also think that, given Kuschner's lack of technical expertise in the area, it was to be expected that he

would not only welcome, but seek out and heavily rely on, Gartzman's advice and active support with respect to the marketing of the films.

It is also clear that Andrama I and its limited partners, and not Andrama Films, bore the risk of loss with respect to the films. To begin with, the out-of-pocket production costs of $139,071.30 incurred by Andrama Films were all paid for out of the partners' contributions of $160,000. Moreover, although by accepting the recourse note Andrama Films in effect agreed to defer immediate reimbursement of certain production costs it incurred in making the films (see p. 474 *supra*), and instead take them out of future profits, its receipt of these payments, plus the approximately $400,000 in profit it realized from the sale of the films, was personally *guaranteed* to it by the assumption agreements signed by the limited partners. As subsequently will appear (see pp. 478-487 *infra*), we have determined that the recourse obligation and the assumption agreements executed by petitioners herein were bona fide and created a genuine liability in favor of Andrama Films. Therefore, although Andrama Films and in turn Gartzman, risked not receiving their money until 1987, Andrama Films would still get paid what it was due under the purchase agreement (with the possible exception of interest on the $600,000 note) even if the films never generated a single dollar of revenue. On the other hand, Andrama I's partners were out-of-pocket $160,000, and on the hook for up to $600,000 more in the event the films were not a success.[19] Furthermore, under the facts and circumstances herein, the fact that Andrama I contracted with ABC to distribute the films does not reflect any absence of ownership. See *Estate of Thomas v. Commissioner*, 84 T.C. 412, 433 (1985).[20]

---

[19]Respondent argues incorrectly that, even if petitioners eventually paid the amounts due under the assumption agreements, the tax savings generated by the partnership's depreciation deductions would raise almost all of the capital needed to pay off the note. Assuming a 50-percent tax bracket, the maximum tax savings through depreciation that the partners could have expected to realize was $375,000 (.50 × $750,000), while their maximum out-of-pocket liability stood at $760,000 ($160,000 + $600,000). Even if we add the tax savings by way of investment credit (see note 31 *infra*), the total tax savings clearly would not generate enough funds to pay off the note. Respondent does not argue that we should take into account the time value of the use of the tax savings, and we are not disposed in this case to consider such an element on our own initiative. Compare *Estate of Baron v. Commissioner*, 83 T.C. 542, 556-557 & n. 40 (1984), affd. 798 F.2d 65 (2d Cir. 1986).

[20]We note that, pursuant to the licensing agreement with ABC, Andrama I still retained many of the risks associated with the films.

Finally, respondent argues that the purchase price paid by Andrama I greatly exceeded the films' fair market value and that, for this reason, the partnership did not acquire an equity in the films. In light of our subsequent finding that the $750,000 purchase price paid by Andrama I approximated the films' fair market value (see pp. 487-489 *infra*), this argument falls by the wayside. Accordingly, in light of all the facts and circumstances, we hold that petitioners have carried their burden of proving that the benefits and burdens of ownership passed from Andrama Films to the partnership and that Andrama I is the true owner of the films.

We now turn to the question of whether petitioners were entitled to depreciation deductions and investment tax credits with respect to Andrama I's ownership of "Moving Up" and "Planning." Sec. 167(a)[21] allows a deduction for depreciation only with respect to property used in a trade or business or held for the production of income. Similarly, only property with respect to which depreciation is allowable qualifies for the investment tax credit under section 48(a)(1). Accordingly, "petitioners' right to both depreciation deductions and investment credit depends upon their showing that [Andrama I's] activity with respect to [the films] either constituted a trade or business or was undertaken and carried on for the production of income." *Beck v. Commissioner*, 85 T.C. 557, 569 (1985). See also *Flowers v. Commissioner*, 80 T.C. 914, 931 (1983).

The threshhold element in determining whether this requirement has been met is a showing that the activity in question was entered into with "the actual and honest objective of making a profit." *Dreicer v. Commissioner*, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). Resolution of this issue must be determined at the partnership level, *Flowers v. Commissioner supra* at 932; *Siegel v. Commissioner*, 78 T.C. 659, 698 (1982); *Brannen v. Commissioner*, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984), and, while a reasonable expectation of profit is not required, a bona fide objective of

---

[21]Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954 as amended and in effect during the year in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.

making a profit must exist. *Dreicer v. Commissioner, supra* at 643-645; see also *Estate of Baron v. Commissioner*, 83 T.C. 542, 553 (1984), affd. 798 F.2d 65 (2d Cir. 1986).

Petitioners contend that, from Andrama I's inception, the partnership has continually carried on its activities with the sole objective of making a profit from the films and they are entitled to their claimed deductions and credits. Respondent, on the other hand, asserts that Andrama I's activities were not founded on a bona fide profit motive because they were carried on primarily, if not solely, for the purpose of obtaining the accompanying tax benefits. Accordingly, respondent argues that (1) petitioners' investment tax credits were properly disallowed, and (2) the partnership's activities were "not engaged in for profit" under section 183,[22] and therefore petitioners' deductions for depreciation should be limited to the extent they are allowed under section 183(b).[23]

The regulations promulgated under section 183 list the following nine relevant factors which should normally be taken into account in determining whether an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation. Sec. 1.183-2(b)(1)-(9), Income Tax Regs. However, this list is by no means exclusive and it is not intended that only these factors are to be taken into

---

[22]Sec. 183(a) provides that if an "activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Sec. 183(c) defines an "activity not engaged in for profit" as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212."

[23]Sec. 183(b)(1) allows those "deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit." Sec. 183(b)(2) allows "a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)."

account in making the determination. Sec. 1.183-2(b), Income Tax Regs. Moreover, the regulations provide that no one factor is determinative (sec. 1.183-2(b), Income Tax Regs.), and accordingly, we do not arrive at "our decision herein by merely counting the factors which support each party's position." *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). Rather, whether Andrama I possessed the requisite profit objective is a question of fact to be determined in light of all the facts and circumstances, *Beck v. Commissioner supra* at 570; *Estate of Baron v. Commissioner supra* at 553; sec. 1.183-2(b), Income Tax Regs. The burden of proving such objective is on petitioners. *Beck v. Commissioner supra* at 570; Rule 142(a).[24]

We note at the outset that, since profit objective is determined at the partnership level, our focus is "on the intent of the general partner and the promoters of [Andrama I] since it is these individuals who actually controlled the partnership's activities." *Fuchs v. Commissioner*, 83 T.C. 79, 98 (1984). See also *Deegan v. Commissioner*, 787 F.2d 825, 826 (2d Cir. 1986), affg. a Memorandum Opinion of this Court; *Fox v. Commissioner*, 80 T.C. 972, 1007-1008 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir.), affd. sub nom. *Barnard v. Commissioner*, 731 F.2d 230 (4th Cir.), affd. without published opinion sub nom. *Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner*, 734 F.2d 5-7, 9 (3d Cir. 1984). Moreover, both parties agree that the focal point with respect to our analysis should be at the beginning of the transaction and that our decision should not be based on objective hindsight. See *Smith v. Commissioner*, 78 T.C. 350, 392 n. 32 (1982). We proceed with our analysis without dealing with each of the factors set forth in the regulations; rather we will deal with the totality of the circumstances revealed by the record herein in the context of the factors

---

[24]In his amended answer, respondent disallowed the Staibs' (docket No. 13992-83) investment tax credit and determined an additional deficiency (see note 2 *supra*). Respondent bears the burden of proof with respect to all issues relevant to the Staibs' investment tax credit. Rule 142(a).

asserted by the parties in favor of their positions. See *Estate of Baron v. Commissioner, supra* at 554.[25]

To begin with, we are satisfied that Kuschner, despite any personal lack of expertise in the nursing and management training field, procured sufficient advice and made sufficient inquiries to make a reasonable determination as to whether the acquisition and promotion of the films would be a profitable venture. To be sure, he relied heavily on Gartzman's experience and reputation as a producer and creator of training films and on the latter's general experience in the industry. However, respondent does not question Gartzman's credentials, and as we alluded to earlier (see pp. 476-477 *supra*), we attach no adverse significance to Kuschner's reliance on Gartzman's expertise, especially in light of Gartzman's strong personal stake in the films' success. Kuschner similarly relied on Ira Victor's management training expertise and experience with respect to hospital nursing. Moreover, Kuschner's decision to acquire the films was obviously influenced by his reliance on ABC's expertise, as well as on its enthusiasm and optimism in the project. Finally, Kuschner undertook his own investigation and contacted nursing administrators at various hospitals [26] and nursing homes to ascertain whether there would be a demand for these types of training films. All in all, we think Kuschner's actions were those of a prudent businessman seeking to educate himself with respect to a new field he was about to enter and knew little about.

We are also satisfied that Kuschner carried out his responsibilities as general partner of Andrama I in a businesslike manner with a constant eye towards making a profit. Not only did he enter into a licensing agreement with a high profile and reputable distributor, but he negotiated terms extremely favorable to the partnership. We are satisfied that, in 1979, Kuschner could not have anticipated that ABC would later change its view of the terms with the result that the agreement was renegotiated. See note 32

---

[25]Our analysis is based upon the fact that this case was tried and briefed by the parties in terms of the presence of a profit objective under section 183 and the regulations thereof. We recognize that our recent opinion in *Rose v. Commissioner*, 88 T.C. 386 (1987), adopts a test of economic substance in the category of "generic" tax shelters. Our conclusion under that test would be the same.

[26]One such administrator was William C. Staib, assistant vice president for St. Luke's Roosevelt Hospital Center in New York during the year in issue, and a petitioner in this case.

*infra.* Moreover, he and Gartzman kept in constant contact with ABC and made numerous suggestions on how ABC could better market and distribute the films. Furthermore, dissatisfied with ABC's results, he and Gartzman sought out a new distributor and Andrama I entered into a distribution agreement with the AJNC in the hope of stimulating sales and rentals of the films. While these later events took place in years not now at issue before the Court, we consider them relevant to the extent that they confirm that Kuschner was at all times interested in the successful distribution of the films and in turning Andrama I into a profitable venture. See *Flowers v. Commissioner*, 80 T.C. at 932.

Finally, the calculations found in the adjusted pro forma income and cash-flow statement on p. 471 *supra*, projected an expected before-tax profit from sales of $216,673 and cash available for distribution to the partners of $396,673. We recognize that these projections were based on assumptions that ABC would sell 2,500 sets of films at $400 per film ($800 per set) (see p. 469 *supra*), assumptions which, in retrospect, may suggest undue optimism on Kuschner's part. However, we think they were within, although perhaps at the outer boundaries of, reasonable estimates of the films' potential for profit and cash-flow as of the summer of 1979. Thus, based on the evidence we have seen and heard, we think that Kuschner's optimism in 1979 with respect to the films' potential was not so unreasonable as to cause us to conclude that the partnership did not have a bona fide profit objective at that time.

Our conclusion in this respect is supported by the fact that both films were well directed and of high quality,[27] and by Schillaci's testimony which confirms that ABC was genuinely excited about the films' prospects and anticipated forging new ground in a high growth area. Moreover, Schillaci stressed that company policy at the time dictated that ABC would not take on a project unless it was "suitable for multiple markets and for markets that we

---

[27]While the quality of the films is not questioned by respondent, we note that Schillaci explained that ABC would not distribute a film unless it was of broadcast quality, i.e., akin to a "20/20" news segment, and that both "Moving Up" and "Planning" were of such quality. Moreover, in 1981 "Moving Up" won the Chris Statuette award for business and industry films at a film festival sponsored by the Film Council of Greater Columbus.

would anticipate." Thus, not only did ABC project sales of 1,000 to 3,000 sets of films to institutional buyers, i.e., hospitals and nursing homes, but it also expected sales from the as yet undeveloped cable delivery and direct home videocassette markets to constitute a major part of ABC's overall plan with respect to the films. We do not share respondent's view that the possibilities of "free lunching" (institutions asking for a loan of the films to determine whether to buy and using that occasion to show the films to its nurses and therefore eliminate the need to purchase them) and of copying in violation of copyright, severely impaired the potential for profitable distribution of the films. We are not persuaded that these possibilities posed a significant threat in 1979 to a financially successful distribution of the films. Moreover, upon further reflection, we think our view expressed at trial that hospital and nursing home budgetary restrictions would inhibit sales of the films was not well taken; we think that the amount of $400 for each film was too small to have had a budgetary impact, particularly in light of the high quality of the films.

In light of ABC's expectations and its commitment towards making the films a success, we find that Kuschner's pro forma estimates, adjusted to reflect a 65/35 split with ABC (see pp. 469, 472 *supra*), were a fair representation of the films' potential for profit. Not only were his revenue estimates within the range projected by ABC for institutional sales, albeit towards the upper end,[28] but they did not even include revenues to be generated from film rentals or from sales in the other markets anticipated by ABC.[29] Thus, we think that, if the films had proven to be as successful as predicted, the partners stood to receive in before-tax dollars $236,673 ($396,673 – $160,000) above their cash investment of $160,000.[30] This disparity between the

---

[28]ABC projected, at the most, revenue of $2,100,000 from such sales (see p. 473 *supra*), while the pro forma projections assumed total receipts of $2 million (2,500 sets × $800).

[29]Although no written estimates appear to have been provided by ABC, we note that the private placement memorandum did discuss the potential for revenue from film rentals and videocassette sales to the home study market. ABC estimated that the sales price for a home study videocassette would be about $80 - $90. See p. 473 *supra*.

[30]This calculation of cash investment, of course, does not take into account the potential liability of petitioners for their share of the $600,000 recourse note. See pp. 484-487 *infra*. If the profit versus tax benefits calculation includes this liability, the disparity in favor of the tax benefits disappears. See also our comment on the element of time value of money as applied to this case, in note 19 *supra*.

$236,673 cash profit and Andrama I's expected net tax benefits of $238,476,[31] is not sufficient to cause us to conclude that Andrama I (i.e., Kuschner) did not have a profit objective aside from these benefits. See *Estate of Baron v. Commissioner*, 85 T.C. at 558-559. In this connection, we note that the degree of prior investigative efforts by Kuschner, his and Gartzman's assiduous follow up of distribution efforts, and the profit versus tax benefit calculations are quite different than those which were the foundation of our decision in *Baron*. See *Waddell v. Commissioner*, 86 T.C. 848, 894 (1986). In view of the foregoing, we conclude that petitioners have carried their burden of proving that Andrama I's acquisition and promotion of the films was motivated by a bona fide objective to make a profit within the meaning of section 183.[32]

We now turn to the question of whether the recourse promissory note constituted a genuine indebtedness fully includable in determining Andrama I's basis for depreciation in the films. Respondent's position is based upon two elements which involve separate considerations (1) that the note, although recourse in form, was in substance a nonrecourse obligation whose repayment was too contingent to be presently includable in basis, and (2) even assuming the recourse nature of the obligation, the $600,000 value of the note should be excluded from basis because the $750,000 purchase price Andrama I paid for the films greatly exceeded their fair market value. Petitioners, on the

---

[31] According to the projections on p. 471 *supra*, the partners were expected to receive a tax benefit from depreciation deductions of $375,000 (50% tax bracket × $750,000 purchase price) and from the investment tax credit of $23,476, for total tax benefits of $398,476. Deducting the $160,000 cash investment results in a net tax benefit of $238,476. See note 19 *supra*.

[32] Since our profit motive analysis has been properly focused solely on the events surrounding Andrama I's acquisition of the films (see pp. 480-481 *supra*), subsequent events which took place in later years, except for the bird-dogging of distribution efforts by Kuschner and Gartzman, have not significantly entered into our decision. Although the final terms agreed to by Andrama I in the licensing agreement in July of 1980 (see p. 472 *supra*) all but eliminated the partnership's potential for profit, we have not factored this into our analysis, because we are satisfied that Kuschner (and Gartzman) believed in good faith that the 65/35 split negotiated in the tentative agreement would constitute the actual terms of the final agreement. By the time ABC reinterpreted its earlier stance in February 1980, the partners' contributions had already been applied to the films' production costs and to the partnership's startup expenses and the assumption agreements had already been signed (not to mention interest was already accruing on the recourse note). Thus, the partners had already committed $160,000 in cash and were personally liable for $600,000 more. Under these circumstances, we think Kuschner's bargaining position with ABC had been sufficiently eroded so that, at this point, he had no choice but to sign the agreements in an attempt to begin generating some type of cash-flow.

other hand, contend that the note is a valid, legally enforceable recourse obligation secured by the limited partners' personal guarantees, and therefore includable in the partnership's basis in the films.

Each limited partner executed a legally binding assumption agreement which personally obligated him to pay off his pro rata share of the principal balance of the recourse note still owed to Andrama Films in October of 1987. This assumption obligation, by its terms, ran directly in favor of the holders of the note. *Abramson v. Commissioner*, 86 T.C. 360, 375 (1986). Respondent does not question the existence of such an agreement nor does he challenge Andrama Films' *right* legally to enforce the note against the limited partners. However, he contends that the pertinent agreements are without economic substance because at the time they were entered into, Andrama Films never *intended* to enforce them, and in turn the limited partners never *expected* to be called upon to pay off the note. As a consequence, he argues that the note is a nonrecourse obligation whose repayment was dependent solely on the success of the films and their generation of future revenues.

To begin with, we think the documentary evidence which we have reviewed, and which the limited partners evaluated before making their investment decisions, including the private placement memorandum, the subscription agreement, and the assumption agreement, make it quite clear that the limited partners were incurring personal recourse liability by subscribing to an interest in Andrama I. Moreover, when questioned at trial with respect to the pro rata share of the note which he had assumed under the assumption agreement, petitioner Staib not only testified that he was "still planning on having to cough that up," but furthermore, that he had not entered into any type of indemnification arrangement which would release him from this liability.

In the same vein, we think the record herein supports a determination that Andrama Films not only considered the note to be a valid recourse obligation but that it fully intended to collect up to the full amount guaranteed by the assumption agreements in the event the films did not produce. Respondent makes much of the fact that

Gartzman's testimony at trial suggests that he only expected to recover the production costs and his own deferred fees from Andrama Films' sale of the films. First of all, it is far from clear that this is the necessary conclusion to be drawn from this testimony. Beyond this, the partnership purchased the films from Andrama Films, in which Gartzman was only a 50-percent stockholder, and not from Gartzman personally. Similarly, the promissory note named Andrama Films, and not Gartzman, as payee. Accordingly, Gartzman's possibly restricted view does not necessarily establish the intent of Andrama Films, of which Salat was an equal 50 percent stockholder. The supplemental agreement (see note 7 *supra*), provided that the decision-making authority with respect to all matters concerning the business affairs of Andrama Films, other than control over the corporation's day-to-day finances which was vested in Gartzman, was to "be shared equally by Gartzman and Salat; any such decisions having a substantial impact upon the affairs of Andrama Films, Ltd. must first be agreed to in writing by Gartzman and Salat." The supplemental agreement also provided that after specified payments to the writer, director, producer, executive producers, and Kuschner, Salat was entitled to *40 percent* of the balance of incoming receipts. In the event the films were not a success, we think it unlikely that, assumption agreements in hand, Salat would have intended simply to forego her share of the gain earned on the sale of the films and not try to collect from the limited partners. At least, there is no evidence in this record to suggest that Salat's view differed from the conclusion as to her attitude which we have drawn from the agreement between the parties. Moreover, and perhaps even more significant, although Gartzman testified that after the collection of his fees and the production costs (approximately $300,000) "the rest [of the money] goes to the investors," we note that the aforementioned supplemental agreement, dated November 19, 1981, and entered into by Gartzman, Salat, and Kuschner, clearly provides that in addition to the initial partner contributions, Andrama Films fully expected to collect out-of-sales receipts up to the full value of the $600,000 promissory note. See note 7 *supra*. We do not have, in the instant case, the type of situation,

which existed in *Webber v. Commissioner*, T.C. Memo. 1983-633, affd. sub nom. *Bryant v. Commissioner*, 790 F.2d 1463 (9th Cir. 1986), and *Roe v. Commissioner*, T.C. Memo. 1986-510, and the cases discussed therein, where objective economic circumstances and direct evidence of intention caused us not to recognize obligations which, on their face, were recourse because we were convinced that they would not be enforced in accordance with their terms. See also *Professional Services v. Commissioner*, 79 T.C. 888, 915-916 (1982). Nor do we attach any significance to the fact that the obligation was not due until a point several years in the future, namely October 1, 1987. *Melvin v. Commissioner*, 88 T.C. 63 (1987).

In connection with the foregoing, we note that the standards for investors (see p. 468 *supra*), demanded à high financial profile and the record contains not a shred of evidence that petitioners herein did not have sufficient finances to meet the obligations they undertook with respect to the $600,000 note. Thus, we are not persuaded that the promissory note should not be accepted at what it purports to be, i.e., an actual recourse indebtedness, which could be expected to be enforced. Accordingly, we move on to respondent's alternative contention that the full amount of the note is not includable in basis because the purchase price paid by Andrama I greatly exceeded the fair market value of the films.

Under sections 1011 and 1012, the tax basis of an asset is generally the same as its cost. However, where the purchase price and the principal amount of a nonrecourse note have been shown to unreasonably exceed an asset's fair market value, the courts have excluded from basis the value of nonrecourse indebtedness used to acquire the asset. Under such circumstances, since there is no economic incentive to repay the obligation, it is considered that no genuine indebtedness exists. *Deegan v. Commissioner*, 787 F.2d at 827; *Estate of Franklin v. Commissioner*, 544 F.2d 1045, 1049 (9th Cir. 1976), affg. 64 T.C. 752 (1975); *Coleman v. Commissioner*, 87 T.C. 178, 209 (1986); *Herrick v. Commissioner*, 85 T.C. 237, 260 (1985). Moreover, the general reasoning of these cases may be applied to cases involving even recourse indebtedness and "serve as precedent for the

Court's disregarding, for tax purposes, a portion of an asset's stated cost where the stated cost is not supported by a realistic valuation of the asset * * * even if the purchasers are considered personally liable for the entire purchase price." *Webber v. Commissioner, supra.* In such situations, the excess of the alleged purchase price over the fair market value of the depreciable asset is allocable to other elements of the transaction. See *Waddell v. Commissioner*, 86 T.C. 848, 912 (1986). Respondent takes the position that the $750,000 purchase price paid by Andrama I greatly exceeds the "realistic valuation" of the films.

Petitioners do not dispute the fact that Kuschner arrived at the $750,000 purchase price by taking the films' production costs and marking that figure up by approximately 100 percent. We think that Kuschner had a valid basis for adopting such a markup, especially in light of the fact that Andrama Films (and Gartzman) were not going to get all their money up front. We do not share respondent's view that we should reject the $750,000 price simply because of the potential conflict of interest arising out of Kuschner's relationships with the investors and Intergroup. Such a bare condition is not, in our opinion, sufficient to cause us to conclude that the arrangements between Andrama Films and Andrama I were not conducted at arm's length.

Fair market value has been defined by respondent's regulations as "the price at which * * * property *would* change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts." Sec. 1.170A-1(c)(2), Income Tax Regs. (emphasis added); see also sec. 20.2031-1(b), Estate Tax Regs. See *United States v. Cartwright*, 411 U.S. 546, 551 (1973) ("The willing buyer-willing seller test of fair market value is nearly as old as the federal income, estate, and gift taxes themselves"). Thus, irrespective of how the purchase price was arrived at, the relevant inquiry is, given the facts and circumstances *as they existed on June 18, 1979*, what *would* a willing buyer have paid Andrama Films for "Moving Up" and "Planning."

Our analysis of the facts and figures in connection with the profit objective issue (see pp. 481-484 *supra*), substan-

tially disposes of the fair market value issue. We were favored with expert testimony as to fair market value, but we were unimpressed with the bulk of this testimony because much of it appears to have been based on factors largely derived from hindsight. While such factors go towards explaining why the films were not as successful as planned, and at most indicate that the parties involved were not as good businessmen as they thought they were, we do not think they are particularly relevant to our conclusion herein.[33] Although the films have not lived up to Kuschner's lofty expectations,

The value of the thing to be taxed must be estimated as of the time when the act is done * * * . It depends largely on more or less certain prophecies of the future, and the value is no less real at that time if later the prophecy turns out false than when it comes out true. Tempting as it is to correct uncertain probabilities by the now certain fact, we are of the opinion that it cannot be done * * * [*Ithaca Trust Co. v. United States*, 279 U.S. 151, 155 (1929). Citations omitted.]

In light of the foregoing, we have made our own determination of fair market value independent of the experts' appraisals. See *Parker v. Commissioner*, 86 T.C. 547, 562 (1986). See also *Abramson v. Commissioner*, 86 T.C. at 372 n. 16. Based on all the evidence we have seen and heard, we are satisfied that the $750,000 price arrived at by Kuschner and agreed to by Gartzman, although not negotiated tooth and nail, nevertheless was the result of arm's-length dealings, and was not in excess of the prices that a willing buyer would have paid for the films given the income stream and cash-flow projections as they existed in the summer of 1979,[34] i.e., the fair market value of films as of June 18, 1979, the date of acquisition by the partnership.[35]

We now turn to the question of whether Andrama I is entitled to the $28,000 in interest deductions taken with respect to the note that were accrued by the partnership

[33]See *Sheid v. Commissioner*, T.C. Memo. 1985-402.

[34]Even after payment of the $150,000 down in cash, and repayment of the $600,000 note plus approximately $250,000 in interest, the projected cash available for distribution to the partners was $396,673, based on the adjusted analysis of the figures in the private placement memorandum. See p. 471 *supra*.

[35]Therefore, the $750,000 depreciable basis claimed by the partnership did not constitute a valuation overstatement within the meaning of sec. 6659(c), and accordingly, sec. 6621(d) is not applicable to petitioners herein.

(which reported on the accrual basis) but not paid in 1979.[36] Section 1.461-1(a)(2), Income Tax Regs., provides that "under the accrual method of accounting, an expense is deductible for the taxable year in which all the events have occurred which determine the fact of the liability and the amount thereof can be determined with reasonable accuracy." Furthermore, as we stated in *Cohen v. Commissioner*, 21 T.C. 855 (1954):

> The rule which emerges from the decisions of this Court is that deductions for accrued interest are proper where it can not be "categorically said at the time these deductions were claimed that the interest would not be paid, even though the course of conduct of the parties indicated that the likelihood of payment of any part of the disallowed portion was extremely doubtful." * * * [21 T.C. at 857.]

We have already established that the note given to Andrama Films should be accepted as a bona fide recourse indebtedness for which the limited partners were personally liable (see p. 487 *supra*), and it is uncontradicted that the note bore interest of 9 percent per annum. Granted that such personal liability did not extend to the interest element by the terms of the note or of the assumption agreements, the proceeds paid over to Andrama Films by the partnership out of distribution revenues were to be applied first to "any accrued and unpaid interest and then to principal." In light of the revenues it was expected the films would generate, we conclude that *at least during the year in issue*, not only had all the events occurred so as to determine the existence of the interest deduction as well as its amount, but that it was extremely likely that at least $28,000 in interest would be repaid. Accordingly, we find that petitioners are entitled to their claimed deduction for 1979.[37]

Finally, we address the issue of whether the total production costs for purposes of computing Andrama I's

---

[36]The partnership claimed a total interest deduction with respect to the note of $33,000, $5,000 of which was prepaid in cash on the date of acquisition. Respondent conceded on brief that this portion of the deduction would be allowable in the event we recognized the bona fides of the sale and the recourse note for tax purposes. Accordingly, in light of our findings above, we deem the allowability of the $5,000 prepaid portion of the interest deduction to be conceded by respondent.

[37]We expressly do not decide whether the same treatment should be accorded interest accrued in subsequent years where the likelihood of payment may well have been quite different.

investment tax credit basis should include only the $139,071.30 paid in cash during the year in issue, or additionally, the $173,928.70 in production costs which were deferred and not paid in that year. Respondent does not dispute that the types of costs at issue herein (mostly deferred compensation for services performed by Gartzman) qualify as production costs as defined under section 48(k)(5)(B), or that these amounts were actually incurred by Andrama Films. Rather, he argues only that these costs should not be included in Andrama I's investment tax credit basis because they were deferred in nature and might never be paid because their payment was contingent solely on the generation of future profits. Since we have already concluded that the note given to Andrama Films should be treated as a bona fide recourse indebtedness for which the limited partners are personally liable (see p. 487 *supra*), it follows that Andrama Films' receipt of these deferred fees was guaranteed and not contingent on the films' future success. Accordingly, we reject respondent's argument and find that the deferred portion of the films' production costs was properly included in the partnership's investment tax credit basis.

One final word. It is not without some doubt that we have reached our conclusion herein that petitioners should prevail. However, we are satisfied that, on the record before us, petitioners have made a prima facie case sufficient to carry their burden of proof in the absence of countervailing evidence. The burden of producing that countervailing evidence was on respondent, and it is our judgment that he has not succeeded in so doing.[38]

To reflect our conclusions herein,

*Decisions will be entered under Rule 155.*

---

[38]Concomitantly, respondent has failed to carry his burden of proof as to the Staibs' investment credit. See note 24 *supra*.