ROLAND C. BRIGGS AND CHRISTINE A. PERSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Briggs v. Commissioner
Docket Nos. 5627-92, 6156-93
United States Tax Court
T.C. Memo 1994-125; 1994 Tax Ct. Memo LEXIS 133; 67 T.C.M. (CCH) 2484; March 28, 1994, Filed *133 Decision will be entered under Rule 155. For petitioners: G. Rodney Kleedehn. For respondent: James R. Robb. CHIECHI
CHIECHI
MEMORANDUM FINDINGS OF FACT AND OPINION CHIECHI, Judge: Respondent determined the following deficiencies in, additions to, and accuracy-related penalties on petitioners' Federal income tax: Additions to Tax
Section
Section
Section
Section
Year
Deficiency
6653(a)(1) [1]
6653(a)(1)(A)
6653(a)(1)(B)
1985
$ 35,737
$ 1,787
$ -- --
1986
40,538
-- 2,027 *
1987
36,318
-- 1,816 *
1988
28,832
1,442
-- --
1989
19,314
-- -- --
1990
17,299
-- -- --
Accuracy-
Related
Additions to Tax
Penalty
Section
Section
Section
Year
6653(a)(2)
6661(a) 6662(a)
1985 *
$  8,934
$ -- 1896
--
10,135
-- 1987
--
9,080
-- 1988
--
7,208
-- 1989
--
-- 3,836
1990
--
-- 3,460
* 50 percent of the Interest due on the portion of the
underpayment attributable to
negligence. Respondent determined that the entire
underpayment was attributable to negligence.
*134 The issues for decision are: (1) Did petitioner Roland Briggs conduct his commercial fishing activity during the years at issue with the objective of making a profit within the meaning of section 183? We hold that he did. (2) Are petitioners liable for any of the years at issue either under section 6653(a) for an addition to tax for negligence or section 6662(a) for an accuracy-related penalty for negligence and/or under section 6661(a) for an addition to tax for a substantial understatement of income tax? We hold that they are to the extent stated herein. FINDINGS OF FACT Some of the facts have been stipulated and are so found. Petitioners Roland C. Briggs (Mr. Briggs) and Christine A. Person (Ms. Person) resided in Anchorage, Alaska, at the time the petitions were filed. Petitioners filed joint Federal income tax returns for each of the years at issue. During those years, Ms. Person was employed full time as a school teacher for the Anchorage School District. Mr. Briggs became an electrical contractor in 1959 and successfully supported himself in that occupation for many years. In 1974, he moved to Alaska and supported himself as an independent electrical contractor *135 through 1976. In 1976, Mr. Briggs was employed by Electrical Maintenance Services (EMS) and worked on Alaska's North Slope in the construction of the Alaska oil pipeline that started at Prudhoe Bay in the northern part of Alaska and extended to Valdez in the southern part of the State. While working for EMS, Mr. Briggs continued doing electrical contracting work on the side, although the volume of that work was not substantial. Subsequent to working for EMS and during the years at issue, Mr. Briggs worked at Prudhoe Bay, Alaska, in a management position with ARCO Alaska, Inc. (ARCO Alaska), a subsidiary of Atlantic Richfield Co. While working for ARCO Alaska during the period 1985 through 1990, Mr. Briggs worked on a week-on, week-off schedule and also had vacation weeks. Consequently, throughout that period, he spent no more than 26 weeks a year working for ARCO Alaska at Prudhoe Bay. Despite his week-on, week-off schedule, Mr. Briggs was able to arrange his work schedule so that he had numerous weeks available for commercial fishing. During the years at issue, Mr. Briggs did not miss opportunities to fish because of his employment with ARCO Alaska. During 1975 through 1977, *136 Mr. Briggs lived in Seward, Alaska, and crewed on an unscheduled basis for various commercial fishing operations. During 1978, Mr. Briggs purchased his own fishing vessel, the Fin Trace, a 32-foot boat with a very limited hold capacity that was designed for fishing within 12 miles of shore and that he used for fishing in the Gulf of Alaska. When Mr. Briggs purchased that vessel, he was aware of Federal law that reserved for U.S. fishing operations those fisheries in the Gulf of Alaska that were located within 200 miles of the U.S. shoreline. [2]
Mr. Briggs used the Fin Trace to fish for halibut from 1978, the year of its purchase, through 1983. Sometime around 1983, because of the depletion in the number of halibut within 12 miles of the Alaskan shoreline and the design limitations of the *137 Fin Trace that prevented it from being used for fishing beyond 12 miles from shore, Mr. Briggs concluded that the Fin Trace was inadequate for use in fishing for that species. Nor did Mr. Briggs find the Fin Trace to be adequate to utilize in fishing for black cod (also called sablefish), an important Alaskan fishing operation which is conducted significantly beyond 12 miles from shore and in which Mr. Briggs decided around 1983 that he wanted to engage. Consequently, in order to be able to fish for halibut and for black cod beyond 12 miles from shore, in 1983 Mr. Briggs contracted to purchase from Delta Marine Industries, Inc. (Delta Marine) a 42-foot vessel that did not have the design limitations of, and therefore was more seaworthy than, the Fin Trace. Mr. Briggs arranged to finance that purchase through the Commercial Fishing and Agriculture Bank of the State of Alaska (CFAB). As part of the loan application he submitted to CFAB, Mr. Briggs provided an estimate of the costs, risks, and returns associated with his planned use of the new vessel for commercial fishing. In this regard, he estimated that the period of time of permitted fishing (hereinafter sometimes *138 referred to as openings, fishing openings, or fishing season) for halibut [3] would be two weeks, that he would fish during that entire period, and that he would catch 42,000 pounds of halibut. [4] He also estimated that the period of time of permitted fishing for black cod would be 11 weeks, that he would fish during that entire period, and that he would catch 184,800 pounds of black cod. [5]
*139 Delta Marine was unable to deliver to Mr. Briggs the 42-foot vessel for which he had contracted. It therefore offered to build him a 48-foot vessel. Mr. Briggs agreed, and in 1983 he signed a contract, to purchase a larger, 48-foot vessel that was named the F/V [6]Good Hope (the Good Hope). CFAB, which had originally agreed to finance Mr. Briggs' purchase of a 42-foot vessel, decided not to provide the financing for the Good Hope because (1) Mr. Briggs had failed to consult with CFAB prior to his contracting to purchase that larger vessel and had therefore violated CFAB protocol, and (2) CFAB had tightened its lending requirements in response at least in part to trouble it was experiencing on defaults of vessel loans it had made to crab fishermen. Since CFAB declined to provide financing for the Good Hope, Mr. Briggs arranged in 1983 to finance $ 175,000 of its total cost of about *140 $ 259,000 through People's Bank in Seattle, Washington. This total cost of approximately $ 259,000 consisted of the original purchase price of $ 223,000 and $ 35,583 in improvements Mr. Briggs added to the vessel in 1984 in connection with its purchase. [7]
At the time Mr. Briggs financed the purchase of the Good Hope, his net worth was $ 174,600. On three different occasions during the years at issue, Mr. Briggs refinanced the loan he had obtained for the purchase of the Good Hope, each time reducing his interest expense thereon. [8] Mr. Briggs paid off the debt related to his purchase of the Good Hope, in either 1990 or 1991. *141 Since its acquisition, Mr. Briggs has used the Good Hope only for commercial fishing, and not for pleasure or recreational fishing. [9] The Good Hope is 49 feet, 4 inches in length and has a net tonnage of between 32 and 33 net tons. It has railings, high bulwarks, and scuppers that quickly relieve water that washes over the boat's railings. Vessels that are the size of the Good HOpe are commonly used in Alaska for commercial fishing. During the years at issue, Mr. Briggs added sodium vapor lights and quartz 500-watt deck lights to the Good Hope in order to be able to fish during nighttime hours. Fishing in the Gulf of Alaska can be very dangerous. A number of commercial fishing boats usually sink there, principally because of bad weather. During the years at issue, Mr. Briggs usually fished far *142 from shore in the most dangerous areas of the Gulf of Alaska, where Coast Guard safety requirements are the strictest. In order to be permitted to fish there, Mr. Briggs purchased during the years at issue an ocean-service life raft, exposure suits, and emergency position-indicating radio beacons of two different frequencies. Since 1978, when he first acquired the Fin Trace, Mr. Briggs has bottom fished, using the longline method. Longlining is the only legal commercial fishing technique for directed halibut fishing and the major commercial fishing technique for directed black cod fishing. [10] Longlining is illegal for sport fishing. A longline fishing string is composed of the following elements. At the water's surface is a "pole" comprised of a weighted float to which a radar reflector and a flashing light are attached. The pole is attached to a round float, *143 75 inches in circumference, bearing a fishery number and the name of the vessel to which the longline fishing string belongs. An anchor line, measuring between 660 feet and 1,020 feet in length, is attached to the bottom of the round float and descends to the ocean floor. An anchor that normally weighs about 50 pounds is attached to the anchor line. Also attached to the anchor and resting on the ocean floor is the ground line. The ground line is comprised of 6 to 20 "skates", each skate being 1,800 feet in length. Approximately every nine feet along the skate is a gangion (also called a leader) at the end of which is a fishing hook. Mr. Briggs had approximately 195 fish hooks per skate. A seven-pound anchor chain also is attached to a skate. The ground line is attached to a second 50-pound anchor at its opposite end, from which a second anchor line rises to the ocean's surface. A second round float is attached to that anchor line, and a second pole is attached to the round float. When longline fishing during the years at issue, Mr. Briggs set up to four longline fishing strings in the water. The number of strings he set was dependent on the location of the fish and the *144 ocean floor's configuration. Each skate is brought onto the GoodHope in a galvanized tin washtub (tub). For each fishing trip during the years at issue, Mr. Briggs generally placed approximately 50 to 60 tubs aboard the GoodHope. At one time, Mr. Briggs had in excess of 80 tubs. In addition to the $ 35,583 in improvements made to the GoodHope in 1984 in connection with its purchase, during the years 1983 through 1985, Mr. Briggs purchased certain other equipment, including electronic equipment, for the GoodHope. The depreciation schedules attached to Mr. Briggs' income tax returns for the years 1983 through 1985 indicate that this other equipment had a total cost of $ 36,963. Sometime after June 9, 1990, and before April 12, 1993, Mr. Briggs installed three model DNG computerized jigging machines on the GoodHope. Mr. Briggs uses this equipment when longline fishing is not allowed by the NMFS. Between fishing trips during the years at issue, Mr. Briggs and Ms. Person prepared the GoodHope for subsequent trips. This preparation included a considerable amount of maintenance and cleanup work, including maintaining the Good *145 Hope's mechanical and electrical systems and cleaning the cabin, other crew areas, and the fishhold. After each fishing trip during the years at issue, Mr. Briggs transported his fishing gear from Seward to Anchorage, where he and Ms. Person prepared the gear for his next trip. Gear preparation and maintenance included removing snarls from the skates, stripping bait, replacing damaged gangions, and replacing rusty or damaged hooks. Preparing skates for subsequent fishing trips took approximately one and a half to three hours per skate. It took Mr. Briggs about three hours to make a new skate from purchased line, gangion line, and hooks. Mr. Briggs devoted time before and during the years at issue to researching Alaska's fisheries, attending fishing seminars, reading trade periodicals, and consulting with other commercial fishermen about the commercial fishing industry. Mr. Briggs also devoted time during the years at issue to handling problems relating to crewmen he hired, such as dealing with issues concerning their performance and compensation and any damage they may have caused to the vessel or the gear. Sometime around 1990, Mr. Briggs began using crewmember applications, *146 agreements, and settlement statements. Those agreements provide personal information on crewmembers, describe their duties, and set forth the amount and manner of their compensation. During the years at issue, Mr. Briggs and his crew longline fished for halibut and black cod. The usual method of baiting a longline fishing string requires crew members to bait individually each hook of a skate. This baiting by hand is often done days before a fishing vessel leaves port. If the weather changes severely, so that the vessel is unable to leave port, the hooks must be unbaited and then rebaited when the weather improves. The time involved in baiting longline fishing strings by hand is financially costly. Mr. Briggs changed his baiting technique no later than sometime in 1986 and began using an automatic snag baiter that required stuck gear. The snag baiter is a baiting device designed by Mr. Briggs which, when the fishing line enters the water, automatically baits hooks as they pass through a chamber loaded with bait. The advantages for Mr. Briggs of using the snag baiter are that it reduces his crew's involvement in the individual hand baiting of hooks and it permits the baiting *147 of hooks as the hooks are placed in the water, thereby eliminating the need to bait hooks days before leaving shore. In preparation for their baiting, hooks are racked in hook cassettes. After the fishing lines have been baited, dropped in the water, and then retrieved, the hooks must be racked again for their subsequent use. Reracking the hooks can take between one, and two hours. At the end of 1992, Mr. Briggs designed gear that allows hooks to be reracked in the hook cassettes as the hooks come aboard. During the 18 days of permitted black cod fishing in 1993, Mr. Briggs used his newly designed reracking gear exclusively, having set 41,500 hooks during that period. In contrast, during the 16 days of permitted black cod fishing in 1992, Mr. Briggs did not have his reracking gear during the whole period and thus was able to set only 18,000 hooks. Mr. Briggs' use of his reracking gear and his snag baiter has increased his efficiency and has reduced his overhead costs, including the amount of labor he needs. By reducing the number of crewmen he needs, Mr. Briggs also has been able to reduce the cost of insuring his crew. The GoodHope was docked in Seward, Alaska, *148 throughout the years at issue. Halibut fishermen from Seward, like Mr. Briggs, traditionally fish in area 3-A or area 3-B. [11] Because of its relative accessibility from Seward, those fishermen prefer area 3-A, which covers the Gulf of Alaska from approximately Yakutat, Alaska, westward to the end of Kodiak Island. Because area 3-B, which begins at the westward end of Kodiak Island and extends westward toward Cape Lutke and the Aleutian Islands, is much farther from Seward than area 3-A is, generally the only time that halibut fishermen from Seward, like Mr. Briggs, fish in area 3-B is when fishing is not simultaneously permitted in area 3-A. During the years at issue, Mr. Briggs departed from Seward, which is east of Kodiak Island, and fished for halibut in either area 3-A or area 3-B of the Gulf of Alaska. For the years *149 indicated, the IPHC permitted halibut fishing in areas 3-A and 3-B on the following total number of days: Year
Days
1980
20
1981
16
1982
18
1983
10
1984
6
1985
7
1986
5
1987
3.5
1988
4
1989
4.25
1990
3
1991
2
1992
4 For each of the years at issue (namely, 1985 through 1990), because of intense competition among halibut fishermen for that limited species, the IPHC reduced substantially the number of days in the halibut fishing season and permitted, on the average, a total of only four and a half days of halibut fishing. For the years 1985 through 1989, the following chart shows the starting and ending dates for halibut fishing in areas 3-A and 3-B and whether Mr. Briggs fished during those fishing openings: Starting
Ending
Total
Fished By
Year
Area Date
Date
Opening Days*
Mr. Briggs
1985
A & B
4/27
4/29
2
Yes
A & B
5/27
5/29
2
Yes
B
6/24
6/25
1
No
B
9/9
9/11
2
Yes
A
9/10
9/11
1
No
1986
A & B
4/30
5/2
2
Yes
A & B
5/29
5/31
2
Yes
B
8/25
8/26
1
Yes
1987
A & B
5/4
5/5
1
Yes
A & B
6/1
6/2
1
Yes
B
9/2
9/3
0.5
No
A & B
9/30
10/1
1
Yes
1988
A & B
5/23
5/24
1
Yes
A & B
6/20
6/21
1
Yes
A & B
9/7
9/8
1
Yes
A & B
10/3
10/4
1
Yes
1989
A & B
5/15
5/16
1
Yes
A & B
6/12
6/13
1
Yes
A & B
9/7
9/8
1
Yes
A & B
10/10
10/11
1.25
Yes
* Generally, fishing openings started at noon on the
starting date and ended at noon on the ending date.
*150 Mr. Briggs did not fish in area 3-A during the fishing opening that began on September 10, 1985, and ended on September 11, 1985; however, he fished in area 3-B during the two-day fishing opening that commenced on September 9, 1985, and closed on September 11, 1985. Mr. Briggs missed the half-day opening that started on September 2, 1987, because that opening did not permit him enough fishing time to justify the expense he would have incurred if he had traveled to area 3-B. In 1990, Mr. Briggs underwent a number of operations for prostate cancer. Consequently, he was not able to fish for halibut as much as he otherwise would have. Mr. Briggs has not missed any halibut openings since 1990. As a result of his fishing for halibut, Mr. Briggs will receive an individual fishing quota (quota), entitling him to a percentage of the halibut harvest, when those quotas are first distributed in either 1994 or 1995. [12] At that time, Mr. Briggs will have the right to sell that quota. *151 For the years 1985 through 1991, Mr. Briggs caught a total of 133,963 pounds of halibut. For this same period, the average total number of pounds of halibut per vessel caught by halibut fishermen on vessels of all sizes in area 3-A or area 3-B of the Gulf of Alaska was 126,349. For the years 1985 through 1991, Mr. Briggs' halibut catch averaged 77 percent of the catch of halibut fishermen who used vessels of comparable length or tonnage as the GoodHope and who fished in area 3-A or area 3-B, ranging from a high of 99 percent in 1985 to a low of 34 percent in 1990, the year Mr. Briggs suffered medical problems. Mr. Briggs also used the GoodHope to fish for black cod. It ordinarily took Mr. Briggs 12 hours to make the 85-mile trip on the GoodHope from Seward to the black cod fisheries in the West Yakutat and Central areas of the Gulf of Alaska. [13]
*152 Black cod fishing requires fishing throughout nighttime hours. Black cod fishing also requires the use of gear and rigging that are different from those used in halibut fishing. For example, different hooks and gangions are used. Mr. Briggs did not fish for black cod in 1984 or 1985 because he did not yet have the necessary black cod gear. In this connection, he did not fish for black cod in 1985 because he was having difficulty recovering halibut gear left at sea that he needed to refit for black cod fishing. By 1986, Mr. Briggs began fishing for black cod, having taken the steps needed to fish for that species, including refitting the gear he had used for halibut fishing so that it could be used for black cod fishing. Like the fishing openings for halibut, the periods during which fishing for black cod is permitted are also restricted. In certain years prior to 1986, the year during which Mr. Briggs began fishing for black cod, the black cod fishing season lasted almost a full year. However, over time, it was reduced because of intense competition among black cod fishermen for that species. For example, during the years 1986 through 1989, the black cod fishing season in *153 the West Yakutat area averaged three and a half weeks, ranging from a high of about five and a half weeks in 1986 to a low of two weeks in 1987. During the years 1986 through 1989, the black cod fishing season in the Central area averaged about eight and a half weeks in length, ranging from a high of about 10 weeks in 1988 to a low of about eight weeks in 1986. In 1993, the black cod fishing season was only 18 days. Although during the years at issue black cod fishing openings extended for a number of weeks and there were no limitations on the amount of black cod that a fisherman could have caught, as a practical matter a fisherman using a vessel that is the size of the GoodHope, as opposed to a much larger vessel, could not have fished every day of an opening because of conditions at sea, the travel time involved in getting to and from the fisheries, and the necessity of returning to port to market fish within four days of their catch. [14]
*154 For the years 1986 through 1989, the following chart shows the starting and ending dates for black cod fishing in the West Yakutat and Central areas of the Gulf of Alaska and whether Mr. Briggs fished in either area during some portion of those black cod fishing openings: Starting
Ending
Total
Fished By
Year
Area
Date
Date
Opening Days
Mr. Briggs*
1986
West Yakutat
4/1
5/10
39
Yes
Central
4/1
5/26
55
1987
West Yakutat
4/1
4/15
14
Yes
Central
4/1
5/29
58
1988
West Yakutat
4/1
5/2
31
Yes
Central
4/1
6/12
72
1989
West Yakutat
4/1
4/17
16
Yes
Central
4/1
5/27
56
* Mr. Briggs did not fish each day of a black cod opening. Not all of Mr. Briggs' fishing trips resulted in catches that he was able to sell to fish processors. When Mr. Briggs was able to market a catch, he usually received a fish ticket and a fresh fish report from the fish processor that purchased his catch. [15] Those tickets and reports document the species and weight of fish purchased. Based on our review of the fish tickets and fresh fish reports Mr. Briggs received and/or the ship log he maintained (discussed below) during the period 1986 through 1990, Mr. Briggs fished on the following occasions *155 for black cod during those years. In 1986, Mr. Briggs had two successful black cod fishing trips. [16] The first of those trips took place during a period in which there was also a halibut opening. It lasted five days, having begun on April 28 and ended on May 2 when Mr. Briggs marketed his catch. During that trip, Mr. Briggs caught both halibut and black cod. His second trip lasted five days, having started on May 4 and ceased on May 8. During the course of that trip, Mr. Briggs had to return to Seward for a short period of time on May 5 to drop off two crewmen; one of those men was suffering from a *156 back injury, and the other was fired. On April 11, 1986, during black cod openings in both the West Yakutat and Central areas of the Gulf of Alaska, Mr. Briggs took the GoodHope on another fishing trip. During that trip which ended about six days later, around April 17, Mr. Briggs had poor catches, lost seven tubs of gear and a pole, and experienced bad weather. During the course of that trip, Mr. Briggs returned to Seward for a four-hour period on April 15 to shower and eat. On April 26, 1986, Mr. Briggs left Seward on the GoodHope to recover some fishing gear. That trip occurred during black cod openings in both the West Yakutat and Central areas of the Gulf of Alaska and preceded by four days *157 halibut openings in areas 3-A and 3-B of the Gulf of Alaska. In 1987, Mr. Briggs had three successful black cod fishing trips. [17] The first of those trips lasted eight days, having begun on April 6 and ended on April 13 when Mr. Briggs marketed his catch. During the course of that trip, Mr. Briggs returned to Seward twice because he encountered bad weather and also needed to purchase groceries and ice. On each of those return trips to Seward, Mr. Briggs remained in port no more than 10 hours before returning to sea again. Mr. Briggs' second successful fishing trip lasted about six days, having started around April 24 and ceased on April 29. The third of those trips took place during a period in which there also was a halibut opening. It lasted three days, having begun on May 3 and ended on May 5. During that third trip, Mr. Briggs caught both halibut and black cod. *158 On May 27, 1987, during a black cod opening in the Central area of the Gulf of Alaska, Mr. Briggs took another fishing trip; however, his skates got severely tangled. In 1988, Mr. Briggs had two successful black cod fishing trips. [18] The first of those successful trips lasted five days, having begun on May 4 and ended on May 8 when Mr. Briggs marketed his catch. Mr. Briggs' second trip took place during a period in which there also was a halibut opening. It lasted seven days, having begun on May 20 and ceased on May 26. During that second trip, Mr. Briggs caught both halibut and black cod. On April 6, 1988, Mr. Briggs began a black cod trip that he aborted. On April 20, 1988, during black cod openings in *159 both the West Yakutat and Central areas of the Gulf of Alaska, Mr. Briggs began another black cod fishing trip that ended around April 25, five days later. During that trip, Mr. Briggs caught a small number of small black cod on test skates and his lines got tangled. In 1989, Mr. Briggs had one successful fishing trip for black cod. [19] That fishing trip lasted about four days, having begun around April 6 and ended on April 9 when Mr. Briggs marketed his catch. [20]
*160 In 1990, Mr. Briggs took three fishing trips for black cod. The first of those trips was an unsuccessful trip that began on May 18 and lasted through at least May 20. The second of those trips was a successful trip that began sometime in late May or early June and ended on June 7. On this second trip, which took place during a period in which there was also a halibut opening, Mr. Briggs also caught halibut and rockfish. His third trip was also a successful trip that began sometime in late June or early July and ended on July 3. Medical problems that Mr. Briggs experienced during 1990 prevented him from fishing more often for black cod during that year. Mr. Briggs has fished during some portion of each black cod fishing opening since 1990. As a result of his fishing for black cod, Mr. Briggs is entitled to receive a quota entitling him to a percentage of the black cod harvest. [21] Mr. Briggs will have the right to sell that quota. *161 Because of the limited number of halibut and black cod fishing openings during the years at issue, no one in Alaska could fish commercially for those species for the entire year. In addition, poor weather conditions in the Gulf of Alaska during certain times of the year and competition among halibut and black cod fishermen adversely affected their ability to fish yearround. During the years at issue, in addition to bottom fishing for halibut and black cod, Mr. Briggs caught other species, including gray cod and rockfish. During the period 1985-1986, Mr. Briggs believed that his catch of gray cod would be significant, since that species did not have the restrictive fishing seasons that characterized the halibut and black cod fisheries. Sometime during that period, Seward Fisheries, a fish processor located in Seward, installed a new fileting line. Mr. Briggs delivered one of the first loads of gray cod to that fish processor after its installation of that new line. Subsequently, however, Icicle Seafoods, Inc. (ISI), which owned Seward Fisheries, had the equipment utilized for the gray cod fileting line at that fishery transferred to another ISI plant located in Petersburg, Alaska, *162 where the equipment had broken down and needed to be replaced. That transfer of the fileting equipment reduced the demand for gray cod at Seward Fisheries. Consequently, Seward Fisheries reduced the price per pound it was offering to fishermen delivering gray cod to only 14 or 15 cents per pound. [22] That price made it difficult for Mr. Briggs to fish profitably for gray cod and he therefore stopped fishing for that species. After acquiring the GoodHope, Mr. Briggs also considered using the GoodHope to fish for shrimp and octopus. At one point, Mr. Briggs set shrimp pots in the water. He recovered no shrimp, however, and subsequently abandoned *163 his shrimp fishing efforts. Mr. Briggs did extensive research concerning octopus fishing. He decided to fish for octopi because they can be used for both food and bait, the period during which they can be caught is unrestricted, and the quantity of them that can be caught is not limited. As part of his octopus fishing research, Mr. Briggs made approximately 50 octopus pots with which he experimented, using them on a longline. After additional research, however, he determined that he would need about 2,000 octopus pots to sustain an economically viable octopus fishing venture. Mr. Briggs therefore abandoned his octopus fishing efforts. Mr. Briggs has not used the Good Hope to fish for salmon, an industry that as of the time of the trial herein was in economic turmoil. He decided not to fish for salmon because of the very large expense of about $ 1 million that he would have been required to incur to be in a position to do so and that included the costs of modifying the Good Hope to fish for salmon, acquiring a salmon fishing permit, and buying a seine or gill net that is used to fish for that species. Mr. Briggs has not fished for crab because of a decline in that fishery. *164 When Mr. Briggs was out fishing on the Good Hope during the years at issue, he and Ms. Person were frequently unable to communicate with each other for five or six days. Ms. Person often worried about the safety of Mr. Briggs while he was fishing. On March 24, 1989, the Exxon Valdez ran aground and caused the largest oil spill (the Valdez oil spill) that has occurred in North American waters. The cleanup of the Valdez oil spill took place during a black cod fishing opening. After returning to Seward from a black cod fishing trip that began in early April 1989, Mr. Briggs lost most of his crew to VECO, an Alaskan corporation that was responsible for cleaning up that oil spill. Consequently, Mr. Briggs temporarily abandoned his fishing efforts. On April 10, 1989, he signed a time charter agreement with VECO (VECO agreement), pursuant to which he agreed to use the Good Hope to assist in the cleanup. The VECO agreement provided that Mr. Briggs was to charter the Good Hope to VECO for a minimum of one day and gave VECO the option to renew this single-day charter for up to 30 days. VECO chartered the Good Hope for 30 days, in return for which Mr. Briggs *165 received approximately $ 60,000. On March 1, 1993, Mr. Briggs and Alyeska Pipeline Service Company (Alyeska) entered into a vessel charter agreement (Alyeska agreement), pursuant to which Mr. Briggs is to use the Good Hope to assist in the cleanup of future oil spills. Under the Alyeska agreement, which extends from March 1, 1993, through December 31, 1999, Mr. Briggs is to be paid $ 22 per foot of vessel per day. He also is required to take part in boat training activities, lasting for two days, for which he is compensated at the same rate. Other than the VECO and Alyeska agreements, Mr. Briggs has not leased the Good Hope. However, sometime during the years at issue, Mr. Briggs attempted to lease the Good Hope to a group of people conducting a geological survey that was to detail the bottom of Resurrection Bay. His leasing offer was not accepted. For the years at issue, Mr. Briggs maintained books and records, including invoices, checks, and fish tickets, relating to his commercial fishing activity and his use of the Good Hope. For each of the years at issue, excluding 1990, Mr. Briggs maintained a ship log in which he documented information relating to, *166 among other things, the Good Hope's maintenance, weather conditions, crew composition and size, dates of fishing trips, and locations where he set his fishing lines. Mr. Briggs did not maintain a ship log for the year 1990 because he fished very little that year as a result of the health problems he was experiencing. For the years at issue, petitioners reported the following total amounts of wages in the joint Federal income tax returns they filed for those years: Year
Wages 1985
$ 129,067
1986
139,833
1987
138,951
1988
135,494
1989
142,072
1990
148,374
For the years indicated, Mr. Briggs reported in his tax returns the following gross receipts, depreciation, interest expenses, and net gain or loss relating to his commercial fishing activity: [23]
Year
Gross Receipts
Depreciation
Interest
Net Gain/(Loss)
1980
$ 4,327
$ 11,451
$  3,899
$  (29,512)
1981
4,666
12,280
0
(33,242)
1982
6,734
0
960
(10,647)
1983
7,098
65,481
15,013
(98,913)
1984
2,803
75,121
25,716
(129,147)
1985
38,570
62,328
27,319
(111,664)
1986
30,553
63,244
20,510
(111,949)
1987
23,329
57,124*
16,070
(104,253)
1988
24,616
7,473
15,155
(49,073)
1989
88,582
1,880
9,865
(1,880)
1990
12,671
3,079
7,939
(46,444)
1991
34,298
1,780
3,736
2,532
1992
36,173
1,194
548
7,818
* This was the last year for which Mr. Briggs claimed
depreciation related to his purchase of the Good Hope.
*167 Mr. Briggs' total annual expenses, including depreciation and interest, relating to his commercial fishing activity have ranged from a high in 1985 of $ 150,234 to a low in 1992 of $ 28,355. Mr. Briggs projects that his future annual fishing expenses will remain at about $ 30,000. In this regard, the Good Hope will not need a major overhaul of its main engine for another 12 to 15 years and, barring fishing gear loss, Mr. Briggs has sufficient gear so that he should not have to purchase additional gear for five or six years. Before they were married, Mr. Briggs borrowed money from Ms. Person in order to sustain his commercial fishing activity. He also borrowed money from the Atlantic Federal Credit Union in order to maintain those operations. During the years at issue, the payment of expenses relating to Mr. Briggs' fishing activity forced petitioners to make sacrifices in their lifestyle. Nevertheless, Mr. Briggs continues to engage in that *168 activity, intending that it will provide him financial security if he cannot remain otherwise employed. Edwin E. Lindbeck, a marine surveyor employed by B.J. Logan Associates, prepared two reports in which he expressed his opinion regarding the fair market value of the Good Hope and certain navigational, safety, and fishing equipment attached to it. In his first report, dated June 9, 1990 (the 1990 valuation report), Mr. Lindbeck estimated that the Good Hope and certain navigational, safety, and fishing equipment attached to it had a value as of that date of $ 310,000. In his second report, dated April 12, 1993 (the 1993 valuation report), Mr. Lindbeck estimated that the Good Hope and certain navigational, safety, and fishing equipment attached to it had a value as of that date of $ 350,000. Items included as part of the value of the Good Hope and certain navigational, safety, and fishing equipment attached to it that are reflected in the 1993 valuation report, but not in the 1990 valuation report, are three model DNG computerized jigging machines, a 24-volt D.C. system used in operating the jigging machines, a stern bait shed, and two pieces of safety equipment *169 located on the Good Hope's flying bridge. As of the trial date of these cases, additional gear not attached to the Good Hope, including tub gear, anchor lines, and anchors, had a replacement value or cost of between $ 20,000 and $ 25,000. As of the same date, other equipment not attached to the Good Hope but used by Mr. Briggs in his commercial fishing activity had a replacement value or cost of approximately $ 5,000 to $ 10,000. To economize during the years at issue and thereafter, Mr. Briggs insured only 80 percent of the fair market value of the Good Hope. As of 1988 and 1989, the Good Hope, the equipment attached to it, and Mr. Briggs' fishing gear comprised over half of his net worth. OPINION Petitioners bear the burden of proving that the determinations made by respondent in the notices of deficiency are not correct. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). They have attempted to satisfy their burden through testimonial and documentary evidence. As for the testimony of Mr. Briggs and Ms. Person, we found each to be credible and forthright. I. Section 183
A. In General
Section 183(a) *170 provides that if an activity is not engaged in for profit, no deduction attributable to that activity is allowed except as provided in section 183(b). Section 183(b)(1) allows certain deductions without regard to whether or not an activity is engaged in for profit. Section 183(b)(2) further allows certain other deductions but only to the extent of the gross income derived from the activity. Section 183(c) defines an activity not engaged in for profit as any activity other than one with respect to which deductions are allowable under section 162 or section 212. In determining whether an activity is engaged in for profit, the taxpayer must show that he or she engaged in the activity with an actual and honest objective of making a profit. E.g., Hulter v. Commissioner, 91 T.C. 371, 392 (1988); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation need not be reasonable, but he or she must have a good faith objective of making a profit. E.g., Dreicer v. Commissioner, supra; sec. 1.183-2(a), *171 Income Tax Regs. Petitioners bear the burden of proving the requisite intent. E.g., Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); Johnson v. Commissioner, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974). The determination of whether an activity is engaged in for profit is to made by reference to all the facts and circumstances. E.g., Hulter v. Commissioner, supra at 393; Taube v. Commissioner, 88 T.C. 464, 480 (1987); sec. 1.183-2(a) and (b), Income Tax Regs. We give greater weight to objective facts than to a taxpayer's mere statement of intent. E.g., Dreicer v. Commissioner, supra; sec. 1.183-2(a), Income Tax Regs.
In determining whether an activity is engaged in for profit, section 1.183-2(b), Income Tax Regs., lists the following nine factors that normally are to be taken into account: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer *172 or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, that is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. The list is not exclusive, and other factors may be considered in determining whether an activity is engaged in for profit. No single factor is dispositive. E.g., Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs. The determination of a profit objective is not based on a mere counting of the number of factors that support each party's position. E.g.; Dunn v. Commissioner, 70 T.C. 715, 720 (1978), affd. on another issue 615 F.2d 578 (2d Cir. 1980); sec. 1,183-2(b), Income Tax Regs.
The parties argue their respective positions by addressing each of the nine factors *173 listed in the regulations under section 183. Consequently, we shall follow the same approach. B. Facts and Circumstances Relating to Mr. Briggs' Fishing Activity
1. The manner in which the activity is carried on
Petitioners contend that, during the years at issue, (1) Mr. Briggs maintained adequate books and records for the Good Hope and his commercial fishing activity, (2) he refinanced the Good Hope to reduce interest expenses, and (3) he developed and used automatic snag baiting gear that reduced the time spent baiting hooks and avoided the wasting of bait and labor when weather prevented fishing after hooks had been baited. Petitioners also point out that Mr. Briggs purchased the Good Hope in the first instance because the Fin Trace was inadequate for him to fish for halibut and for black cod beyond 12 miles from shore. Petitioners further note that, shortly after the years at issue, (1) Mr. Briggs designed and used a hook reracking system that more than doubled the number of hooks that he could place in the water during a fishing period and (2) added jigging equipment that allowed him to fish when longlining was not permitted by the NMFS. Respondent *174 does not dispute that Mr. Briggs maintained adequate records for the Good Hope and his commercial fishing activity during the years at issue. However, she points out that Mr. Briggs did not maintain a ship log for the year 1990 and that he did not begin using crewmember applications, agreements, and settlement statements until 1990. Respondent also contends that the following indicates that Mr. Briggs did not conduct his fishing activity in a businesslike manner: (1) Mr. Briggs did not undertake an analysis of the costs, risks, and returns of running a commercial fishing operation prior to his entering into the activity; (2) CFAB's refusal to finance his purchase of the Good Hope should have served as a warning to Mr. Briggs that his fishing activity would not be profitable and that he needed to reevaluate his decision to fish; and (3) most of the changes in fishing techniques that Mr. Briggs adopted occurred after the years at issue. Based on our consideration of the entire record, we conclude that Mr. Briggs conducted his commercial fishing activity in a businesslike manner. Respondent concedes that Mr. Briggs maintained adequate books and records for the Good Hope *175 and his commercial fishing activity. We reject respondent's contention about the significance of there being no ship log for 1990 and no crewmember documents before that year. Mr. Briggs explained his failure to maintain a ship log in 1990; he fished very little in that year due to health-related problems. Mr. Briggs' failure to use crewmember documents until 1990 is not fatal. In this connection, we note that, before Mr. Briggs started using those documents in 1990, he nonetheless kept track in his ship log of the crewmen he employed on his fishing trips. It is also significant that, during the years at issue, Mr. Briggs both changed his operating method and abandoned unprofitable methods, evidencing that he consistently sought to operate his fishing activity in a businesslike manner in an attempt to make it profitable. Thus, during those years, Mr. Briggs reduced his interest expenses by refinancing the debt he incurred to purchase the Good Hope. [24] He endeavored to lower his insurance expenses by insuring only 80 percent of the fair market value of the Good Hope. He designed and first employed no later than 1986 an automatic snag baiter that reduced his crew's involvement *176 in the individual hand baiting of hooks and permitted the baiting of hooks as the hooks were placed in the water, thereby eliminating the need to bait hooks days before leaving shore and saving money. The reduction of his crew's involvement in baiting hooks permitted him to employ fewer crewmen and thereby reduce his crewman insurance and other crew-related expenses. In addition, Mr. Briggs researched the possibility of fishing other species, but decided not to fish those fisheries where the associated costs were too high and to abandon fishing for a certain species after the prices he was receiving for that species dropped. As a further example of Mr. Briggs' efforts *177 to change his operating method so as to maximize the chances of making a profit from his fishing activity, we note that, in order to expand the number of hours each day during which he was able to fish, he purchased sodium vapor lights and quartz 500-watt deck lights for the Good Hope that enabled him to fish during nighttime hours, especially during black cod openings and short fishing openings. In order to be permitted to fish in areas of the Gulf of Alaska far from shore where Coast Guard safety requirements are strictest, Mr. Briggs also purchased the safety equipment that was mandated by Coast Guard rules. [25]
*178 Respondent makes much of the fact that the evidence does not indicate that Mr. Briggs undertook an analysis of the costs, risks, and returns of running a commercial fishing operation prior to his entering into the activity in 1978, when he purchased the Fin Trace. Although we agree that no formal market study was made by Mr. Briggs, on the record here, we do not find that failure as necessarily evidencing a lack of an intent by Mr. Briggs to conduct his fishing operation in a businesslike manner. In deciding to enter the commercial fishing industry, Mr. Briggs was aware of Federal law that reserved fisheries in the Gulf of Alaska within 200 miles of the U.S. shoreline for U.S. fishermen and that thereby reduced foreign competition for those fisheries and enhanced the likelihood of a successful operation without the presence of foreign competition. Further, his decision to engage in commercial fishing and to continue in this industry throughout and after the years at issue was based on the knowledge and expertise he had acquired as a result of his earlier experience as a crewman on other fishing vessels, his independent research of the commercial fishing industry, his attendance *179 at fishing seminars, his reading of trade periodicals, and his consultation with other commercial fishermen. It seems to us that, as a result of his earlier experience and acquired knowledge, Mr. Briggs understood the costs, risks, and profit potential associated with commercial fishing in the Gulf of Alaska and that his decision to enter into the activity was an informed one, despite the fact that he presented no formal market study supporting his entry into that industry. See Engdahl v. Commissioner, 72 T.C. 659, 668 (1979). We also reject respondent's contention that CFAB's refusal to finance Mr. Briggs' purchase of the Good Hope is evidence that he did not act in a businesslike manner when he decided to purchase the Good Hope in order to be able to fish for halibut and black cod far from Alaska's coast. CFAB's refusal to finance Mr. Briggs' purchase of the Good Hope was attributable to (1) Mr. Briggs' failure to follow CFAB protocol and (2) tightened lending restrictions CFAB was forced to institute in response to trouble it was experiencing on defaults of vessel loans it had made to crab fishermen. Thus, CFAB's refusal to finance *180 Mr. Briggs' purchase of the Good Hope was not attributable to a determination by that lending institution that Mr. Briggs' fishing operation could not be a profitable activity. Moreover, it is significant that Mr. Briggs successfully obtained financing for the purchase of the Good Hope from People's Bank. It seems to us that the decision of People's Bank to lend Mr. Briggs $ 175,000, when his net worth was only $ 174,600, had to be premised to a substantial extent on its belief that Mr. Briggs could successfully operate his commercial fishing activity. Based on the foregoing facts and circumstances, factor one favors petitioners. 2. The expertise of the taxpayer or his advisers
Respondent concedes that throughout the pertinent period Mr. Briggs had a thorough knowledge of the fishing industry in Alaska and therefore agrees with petitioners that factor two favors them. 3. The time and effort expended by the taxpayer in carrying on the activity
Petitioners contend that (1) Mr. Briggs did not miss opportunities to fish because of his employment with ARCO Alaska, having arranged his schedule so that he fished 17 of the 19 halibut openings during the period 1985 *181 to 1989 and fished during a portion of each of the black cod openings after 1985; (2) he devoted a considerable amount of time to gear repair and maintenance and boat maintenance after each fishing trip; (3) when he was unable to fish in 1989 because of the Valdez oil spill, Mr. Briggs chartered the Good Hope to VECO, agreeing to help in the cleanup of the spill; and (4) he spent time researching and attempting to fish other fisheries besides those for halibut and black cod. Respondent acknowledges that Mr. Briggs and Ms. Person performed all the maintenance work on Mr. Briggs' fishing gear and spent a considerable amount of time after each of his fishing trips cleaning the Good Hope. Respondent also acknowledges that Mr. Briggs devoted time to the Good Hope's maintenance. Although respondent notes that Mr. Briggs offered no explanation for his missing the one-day halibut opening in area 3-B that started on June 24, 1985, and ended on June 25, 1985, she does not argue that Mr. Briggs did not devote sufficient time to halibut fishing. Rather, respondent contends that if Mr. Briggs had had the objective of making a profit from his commercial fishing activity, he *182 would have devoted more time to fishing for black cod during the years at issue. We disagree. We note that Mr. Briggs' failure to fish for black cod prior to 1986 was attributable to the fact that he lacked black cod fishing gear and needed to refit his halibut fishing gear before he could fish for black cod. His failure to fish more often for black cod in 1989 was attributable to the Valdez oil spill and his decision to charter the Good Hope to VECO after he had lost most of his crew to the Valdez cleanup efforts and was unable to continue fishing during the period of those efforts. Finally, his failure to fish more often for that species in 1990 was attributable to the medical problems he experienced during that year. During the years 1986 through 1988, Mr. Briggs had both successful and unsuccessful black cod fishing trips. During the black cod season in 1986, Mr. Briggs made a total of three fishing trips, totaling 17 days. [26] During the black cod season in 1987, Mr. Briggs made a total of four fishing trips, totaling 18 days. [27] During the black cod season in 1988, Mr. Briggs made a total of three fishing trips, totaling 18 days. [28] Thus, during the black *183 cod fishing seasons for 1986 through 1988, Mr. Briggs averaged a total of three fishing trips, spending approximately two and a half weeks at sea. In addition, it appears that, after each fishing trip, Mr. Briggs and Ms. Person devoted approximately 75 to 180 hours preparing Mr. Briggs' skates for each subsequent fishing trip. [29] Mr. Briggs also spent time cleaning and maintaining the Good Hope between those fishing trips. Finally, we note that Mr. Briggs could not fish every day of a long black cod fishing opening due to time spent traveling on the Good Hope to and from the black cod fisheries and the need to return to port to market his fish within four days of its being caught. *184 Based on all the facts and circumstances, we conclude that Mr. Briggs devoted a significant amount of time to his fishing activity during black cod fishing seasons for the years 1986 through 1988 and that there were adequate explanations for his failure to fish for black cod during 1984 and 1985 and to fish more for that species during 1989 and 1990. Although, if it had been respondent's decision, she apparently would have fished more for black cod than Mr. Briggs did, on the instant record, we find that, during the fishing openings for the years at issue, Mr. Briggs spent substantial amounts of time devoted to his commercial fishing operation so as to evidence his intention to make a profit from that activity. Based on the foregoing facts and circumstances, we find that factor three favors petitioners. 4. The expectation that assets used in the activity may appreciate in value
Petitioners note that Mr. Briggs purchased the Good Hope for $ 223,000 and paid an additional amount of $ 35,583 for improvements to that vessel in connection with its acquisition. They further point out that, as of April 12, 1993, the Good Hope and certain navigational and fishing equipment *185 attached to it had a fair market value of $ 350,000. Petitioners also note that the quotas Mr. Briggs is entitled to receive are valuable assets that he will have the right to sell. Respondent accepts that, as of April 12, 1993, the fair market value of the Good Hope and certain equipment attached to it was $ 350,000. Nevertheless, she argues that petitioners have not established that the Good Hope and certain equipment attached to it have appreciated in value. In this regard, respondent argues that (1) Mr. Briggs testified that he had purchased the Good Hope for approximately $ 259,000, (2) the amended tax return Mr. Briggs filed for 1986 discloses that he purchased an additional $ 35,583 in miscellaneous equipment that was attached to the Good Hope in 1984 for which he failed to claim depreciation until filing that amended return, (3) the tax returns Mr. Briggs filed for the years 1983 through 1985 show that he added $ 36,963 in additional equipment, including electronic equipment, to the Good Hope, and (4) during the years 1991 through 1993, Mr. Briggs added the automatic snag baiter to the vessel and three model DNG computerized jigging machines. Relying *186 on these four alleged points and with no further explanation, respondent concludes: "Accordingly, the Good Hope has not appreciated in value." She also argues that the income from the commercial fishing activity, together with the value of the quotas to which Mr. Briggs is entitled, are not sufficient to exceed the expenses of his fishing activity. On the present record, we reject respondent's position with respect to whether petitioners have shown that Mr. Briggs had a bona fide expectation that the assets used in his fishing operation may appreciate in value. With respect to the first point on which respondent relies (namely, that Mr. Briggs testified that he had purchased the Good Hope for approximately $ 259,000), we find that Mr. Briggs was referring to that vessel's total acquisition cost consisting of the Good Hope's original purchase price of $ 223,000 and the $ 35,583 in improvements he added in 1984 to that vessel in connection with its purchase, but failed to depreciate until he filed his amended tax return for 1986. This brings us to the second point on which respondent relies (namely, that the amended tax return Mr. Briggs filed for 1986 discloses that *187 he purchased an additional $ 35,583 in miscellaneous equipment that was attached to the Good Hope in 1984 for which he failed to claim depreciation until filing that amended return). While we agree that Mr. Briggs purchased $ 35,583 in improvements in 1984, as just discussed, they are already included as part of the $ 259,000 purchase price of the Good Hope. Thus, we find that respondent is erroneously double counting those improvements. With respect to the third point on which respondent relies (namely, that the tax returns Mr. Briggs filed for the years 1983 through 1985 show that he added $ 36,963 in additional equipment, including electronic equipment, to the Good Hope), we agree that that is the case. The $ 36,963 cost of that additional equipment must be added to the Good Hope's total acquisition cost of approximately $ 259,000 in order to determine if that vessel and certain equipment attached to it have appreciated in value. With respect to the last point on which respondent relies (namely, that, during the years 1991 through 1993, Mr. Briggs added the automatic snag baiter and three jigging machines to the Good Hope), we have found, contrary to respondent's *188 contention, that Mr. Briggs' automatic snag baiter was first used no later than 1986. We agree with respondent that the jigging equipment was added to the Good Hope after June 9, 1990, the date of the 1990 valuation report, and before April 12, 1993, the date of the 1993 valuation report. However, the record does not disclose the cost of that equipment. [30] Since we cannot determine that cost, we cannot use the 1993 valuation report to determine whether the Good Hope and certain equipment attached to it had appreciated in value as of April 12, 1993, the date of that report. Nonetheless, based on the 1990 valuation report of *189 the Good Hope and certain equipment attached to it, we find that, as of June 9, 1990, the date of that report, the Good Hope and the equipment attached to it had appreciated in value. On the record here, we find that the cost of the Good Hope and that equipment was $ 295,546 on June 9, 1990. According to the 1990 valuation report, their fair market value was $ 310,000. Thus, as of June 9, 1990, the Good Hope and certain equipment attached to it had appreciated in value by approximately five percent. Moreover, although we do not know the cost of the jigging equipment that was added to the Good Hope sometime after June 9, 1990, and before April 12, 1993, the date of the 1993 valuation report, it appears to us that the Good Hope and certain equipment attached to it have continued to appreciate. [31]
*190 It is also significant that Mr. Briggs was to receive in 1994 or 1995 certain halibut and black cod quotas. There is evidence in the record that, by some estimates, those quotas are worth three or more times the value of a fisherman's historical catch during certain years, including the years at issue. [32] Mr. Briggs' average gross receipts from his commercial fishing activity during the years at issue were $ 26,387, and his average gross receipts from that activity for the period 1985 through 1992 were $ 28,599. [33] Thus, by some estimates, the value of Mr. Briggs' quotas is at least three times the average of Mr. Briggs' gross receipts from his fishing activity for the period 1985 through 1992, or at least $ 85,797. The June 9, 1990 appreciation of the Good Hope and certain equipment *191 attached to it and the value of Mr. Briggs' quotas may not have been sufficient to offset the losses Mr. Briggs incurred through 1990 in his fishing activity. However, there has been a downward trend in the amount of losses from that operation, and it did in fact generate a small profit in 1991 and 1992. In this connection, we note that Mr. Briggs indicated that his future annual fishing expenses have stabilized and are projected to remain at about $ 30,000. Mr. Briggs has taken steps both during and after the years at issue to cut costs associated with his commercial fishing operation and to increase his chances of catching a greater number of fish. Based on the entire record, we find that Mr. Briggs had a bona fide intention that the expected appreciation of assets used in his fishing operation, when realized, would, together with the income from that activity, exceed the losses incurred in that operation. See Engdahl v. Commissioner, 72 T.C. at 668-689; sec. 1.183-2(b)(4), Income Tax Regs.
Based on the foregoing, we find that factor four favors petitioners. 5. The success of the taxpayer in carrying on other similar or dissimilar activities
*192 Petitioners contend that Mr. Briggs' ability to support himself successfully as an independent electrical contractor in the past supports their contention that he engaged in his fishing activity with a profit objective. Respondent counters that the individual income tax returns filed by Mr. Briggs for the years 1980 through 1984 and the joint income tax returns he filed for the years 1985 through 1987 reflect losses resulting from Mr. Briggs' electrical contracting activity. Mr. Briggs testified, and we have found as a fact, that at least through 1976 he successfully supported himself as an independent electrical contractor. Even though respondent is correct that the returns for 1980 through 1988 reflect only losses associated with Mr. Briggs' electrical contracting activity, we attribute those losses to Mr. Briggs' shift of emphasis away from his independent electrical contracting business following the start of his employment with EMS in 1976. The fact that his electrical contracting activity had begun to generate losses after his decision to deemphasize that business does not detract from the fact that, for many years, Mr. Briggs had successfully supported himself as an independent *193 electrical contractor. Notwithstanding the foregoing, petitioners have failed to demonstrate that, in years when Mr. Briggs successfully supported himself as an independent electrical contractor, he also was able to conduct a second successful activity. Based on the foregoing, we find that factor five favors respondent. 6. The taxpayer's history of income or loss with respect to the activity
Petitioners contend that the losses generated by Mr. Briggs are to some extent attributable to unforeseen circumstances beyond his control. In this regard, they point to the reduction in the number of days comprising fishing openings for halibut and black cod and to Mr. Briggs' medical problems in 1990. Petitioners also assert that the profitability of Mr. Briggs' fishing activity was adversely affected by the depreciation and mortgage interest expenses he claimed as a result of his purchase of the Good Hope. Mr. Briggs stopped depreciating the Good Hope in 1987 and stopped paying interest on the debt related to the Good Hope's purchase in 1990 or 1991. Respondent counters that (1) the series of losses relating to Mr. Briggs' fishing activity began in 1978 and continued *194 through 1990, a period of 13 years, (2) those losses were substantial in amount, and (3) Mr. Briggs' fishing expenses, excluding depreciation, exceeded his income from this activity during the years 1980 through 1990. Although the reduction throughout the years at issue in the number of days comprising fishing openings for halibut and black cod and Mr. Briggs' medical problems in 1990 may have contributed to the amount of losses he reported from his fishing activity for those years, that activity nonetheless generated a series of substantial losses for the years through 1990. Moreover, if we were to disregard Mr. Briggs' depreciation and interest expenses for the period from 1980 through 1990, Mr. Briggs' fishing activity would still have generated losses in every one of those years except 1989. Based on the foregoing, we find that factor six favors respondent. 7. The amount of occasional profit, if any, which is earned
Petitioners acknowledge that Mr. Briggs has not achieved large profits in his fishing activity. Nonetheless, they argue that a portion of the losses generated by Mr. Briggs was attributable to unforeseen circumstances and that innovations he has developed *195 and employed, such as the snag baiter and the hook reracking gear, have improved both his efficiency as compared with other commercial fishermen and his chances of generating a profit. Indeed, petitioners point out that Mr. Briggs reported profits in his tax returns from his commercial fishing operation for 1991 and 1992. [34]
Respondent contends that Mr. Briggs' history of substantial losses from his fishing activity indicates that Mr. Briggs did not conduct his fishing activity with a profit objective. In particular, she points out that, following his acquisition of the Fin Trace in 1978, Mr. Briggs did not report a profit in his tax returns from his fishing activity until 1991, when he reported a profit of only $ 2,532. We note that Mr. Briggs' fishing activity did generate some, albeit small, profits for 1991 and *196 1992, years immediately following the years at issue and that, for some years at least, extenuating circumstances may have contributed to some of Mr. Briggs' losses from his fishing activity. Moreover, Mr. Briggs has taken steps to reduce the costs associated with his fishing activity and to increase the chances that that activity will be profitable in the future. It is significant that the losses from Mr. Briggs' commercial fishing activity have trended downward during the years at issue, [35] and, in fact, a profit trend, commencing during 1991, appears to have been established. Nevertheless, Mr. Briggs' reported profits from his commercial fishing operation are small when compared to the total losses he has reported from that activity. See sec. 1.183-2(b)(7), Income Tax Regs.
*197 Based on the foregoing, we find that factor seven is neutral. 8. The financial status of the taxpayer
Petitioners point to the fact that at the time Mr. Briggs initially financed $ 175,000 of the purchase price of the Good Hope, his net worth was only $ 174,600, and that, in 1988 and 1989, the Good Hope and Mr. Briggs' fishing gear constituted over half of his net worth. Respondent contends that petitioners' combined wages from ARCO Alaska and the Anchorage School District during the years at issue were sufficient to absorb the losses from Mr. Briggs' commercial fishing activity during those years. Respondent further contends that Mr. Briggs has been able to pay for a substantial portion of the Good Hope's purchase through tax savings generated by the losses arising from his fishing activity. Despite petitioners' income, Mr. Briggs did have to borrow money from Ms. Person and the Atlantic Federal Credit Union to sustain his fishing activity. Moreover, the payment of expenses relating to that activity has forced petitioners to sacrifice and make changes in their lifestyle. Nonetheless, the amount of petitioners' combined wages during the years at issue was *198 substantial, and petitioners have not substantiated that the losses Mr. Briggs sustained from his commercial fishing activity prevented them from living a comfortable life. See Golanty v. Commissioner, 72 T.C. at 428-429. Based on the foregoing, we find that factor eight favors respondent. [36]
9. The extent to which elements of personal pleasure or recreation are involved
Respondent concedes that Mr. Briggs did not engage in his fishing activity primarily for pleasure or recreation and that therefore factor *199 nine favors petitioners. In this regard, both parties noted the high degree of danger associated with Mr. Briggs' fishing activity. C. Conclusion
Based on our consideration of all the facts andcircumstances disclosed in the record, we hold that, for each of the years at issue, Mr. Briggs engaged in his commercial fishing activity with an actual and honest objective of making a profit. In reaching this conclusion, we were particularly influenced by the competent and businesslike manner in which Mr. Briggs operated his fishing activity, by the innovations which he designed and employed to make his fishing activity more efficient, by the expertise which he brought to his activity, and by the high danger involved in that activity in which he was involved. [37]
II. Additions to Tax and Accuracy-Related Penalty
We have held *200 that Mr. Briggs' commercial fishing operation was an activity engaged in for profit. Consequently, petitioners' claimed deductions and credits with respect to that activity for each of the years at issue will not result in an underpayment of tax and cannot give rise to any additions to tax under section 6653(a) or 6661(a) or accuracy-related penalty under section 6662(a) for any of those years. However, respondent disallowed deductions claimed by petitioners relating to not only Mr. Briggs' commercial fishing activity during the years at issue, but also certain teaching and fishing activities engaged in by Ms. Person during 1985 and certain expenses relating to Mr. Briggs' electrical contracting activity during 1985 through 1988. [38] Although petitioners did not agree with respondent's disallowance of deductions associated with Ms. Person's teaching and fishing activities and Mr. Briggs' electrical contracting activity, they decided not to contest respondent's disallowance of those deductions in order to focus their attention on the issue relating to Mr. Briggs' commercial fishing operation. Thus, issues remain as to (1) whether the underpayment of tax for any of the years 1985 *201 through 1988 that is attributable to the deductions which petitioners chose not to dispute is due to negligence within the meaning of section 6653(a), and (2) whether the amount of any such underpayment that is attributable to a substantial understatement of income tax for any of the years 1985 through 1988 is subject to the addition to tax imposed by 6661(a). Petitioners have presented no evidence and made no argument (1) supporting their claim to the disallowed deductions that they have not contested for the years 1985 through 1988, [39] or (2) showing that they were not negligent in claiming those disallowed deductions. Petitioners thus have not met their burden of proving that any underpayment of tax attributable to such disallowed deductions for any of those years was not due to negligence. They therefore are liable for each such year for the additions to tax under section 6653(a). *202 Nor have petitioners satisfied their burden of showing why they are not liable for any of the years 1985 through 1988 for the addition to tax imposed by section 6661(a). Consequently, assuming arguendo that there is an underpayment of tax for any such year which is attributable to an understatement of income tax that is due to the deductions which they chose not to dispute and that is substantial within the meaning of section 6661(b)(1), petitioners will be liable for each such year for the addition to tax imposed by section 6661(a). To reflect the foregoing, Decisions will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code in effect for the years at issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. Specifically, the Federal law of which Mr. Briggs was cognizant was the Fishery Conservation and Management Act of 1976, Pub. L. 94-265, 90 Stat. 331, 337, also known and hereinafter referred to as the Magnuson Act.↩
3. Fishermen are allowed to fish for halibut only during the days of a halibut fishing opening. Similarly, fishing openings for other species establish the days during which fishermen are permitted to fish for those other species.↩
4. The International Pacific Halibut Commission (IPHC), which is composed of individuals appointed by the governments of Canada and the United States, manages the halibut fishery in the Gulf of Alaska and establishes the halibut fishing openings there.↩
5. The Fishery Management Division of the National Marine Fisheries Service (NMFS) establishes the black cod fish openings in the Gulf of Alaska.↩
6. The designation "F/V" is the United States Coast Guard (Coast Guard) designation for a commercial fishing vessel.↩
7. Mr. Briggs inadvertently failed to claim depreciation deductions relating to those improvements until petitioners filed an amended return for their 1986 taxable year.↩
8. One of those refinancings occurred because of the acquisition by U.S. Bank of the original lender, People's Bank.↩
9. Mr. Briggs first used the Good Hope for commercial fishing in 1984. Mr. Briggs executed a sales agreement for the Fin Trace↩ in December 1984. He sold that vessel for approximately $ 41,000.
10. "Directed" fishing is a fisheries management term and describes the fish species which a fisherman intends to catch and for which he sets his gear.↩
11. The parties agree that area 3-A and area 3-B are two halibut fishing areas in the Gulf of Alaska that were so designated during the years at issue by the commission supervising halibut fishing.↩
12. Over the years, since passage of the Magnuson Act in 1976, which reserved for U.S. fishing operations those fisheries in the Gulf of Alaska that were located within 200 miles of the U.S. shoreline, it became apparent that Alaska's fisheries, including those for halibut and black cod, were attracting too many U.S. fishermen. Consequently, fishing seasons were reduced from months to days to even hours. In an effort to manage better Alaska's halibut and black cod fisheries and to end the practice of having the annual catches of those two species dumped on the market in a very short time frame, in 1993, Federal officials approved a quota system pursuant to which the ownership of the halibut and black cod fisheries off the coast of Alaska will be distributed to a limited number of boat owners. A quota will grant its holder a percentage of the total allowable catch of the fish species to which the quota relates and permit its holder to fish for that species at his or her leisure. Fishermen will receive quotas based mainly on their historical catch records during certain years, including the years at issue. It is hoped that the quota system will result in higher prices for fish and more fresh fish for consumers.↩
13. The parties agree that the West Yakutat area and the Central area are two black cod fishing areas in the Gulf of Alaska that were so designated during the years at issue by the NMFS.↩
14. Fish held in a slurry of ice and seawater for more than four days are not marketable.↩
15. Hereinafter, we will refer to any fishing trip of Mr. Briggs that resulted in his selling his catch to, and receiving a fish ticket and/or a fresh fish report from, a fish processor as a successful fishing trip and to any fishing trip of Mr. Briggs that did not result in a catch which he sold to a fish processor and for which he received a fish ticket and/or a fresh fish report as an unsuccessful fishing trip.↩
16. The dates of Mr. Briggs' black cod fishing trips in 1986 corresponded with black cod openings in both the West Yakutat and Central areas of the Gulf of Alaska. It is unclear from the record in which of those two areas Mr. Briggs was fishing during his two successful black cod fishing trips in 1986.↩
17. The dates of Mr. Briggs' first black cod fishing trip in 1987 corresponded with black cod openings in both the West Yakutat and Central areas of the Gulf of Alaska. It is unclear from the record in which of those two areas Mr. Briggs was fishing during his first successful black cod fishing trip in 1987. The dates of Mr. Briggs' second and third successful black cod fishing trips in 1987 corresponded only with black cod openings in the Central area of the Gulf of Alaska. Consequently, we presume that Mr. Briggs must have been fishing in only the Central area during his second and third successful black cod fishing trips in 1987.↩
18. The dates of both of Mr. Briggs' successful black cod fishing trips in 1988 corresponded only with black cod openings in the Central area of the Gulf of Alaska. Consequently, we presume that Mr. Briggs must have been fishing in only the Central area during his successful black cod fishing trips in 1988.↩
19. The dates of Mr. Briggs' black cod fishing trip in 1989 corresponded with black cod openings in both the West Yakutat and Central areas of the Gulf of Alaska. It is unclear from the record in which of those two areas Mr. Briggs was fishing during his successful black cod fishing trip in 1989.↩
20. As discussed below, after that fishing trip, Mr. Briggs chartered the GoodHope for a 30-day period to VECO, Inc. (VECO), an Alaskan corporation given the responsibility of cleaning up the oil spill that resulted when the ExxonValdez↩ ran aground in Prince William Sound on March 24, 1989.
21. The quota system for black cod is similar to that for halibut described supra↩ note 12.
22. As a point of comparison, during the years at issue, Mr. Briggs received a low price of 45 cents per pound for halibut on April 28, 1985, and a high price of $ 1.80 per pound for that species on August 28, 1986. He received a low price of $ .27 per pound for black cod on May 5, 1987, and a high price of $ 1.72 per pound for that species on May 8, 1988.↩
23. Mr. Briggs also reported losses from fishing for 1978 and 1979.↩
24. Respondent argues that one of those refinancings was motivated not by Mr. Briggs' desire to reduce his interest expenses, but was initiated by U.S. Bank when it acquired People's Bank. However, the record establishes that Mr. Briggs' two other refinancings of the Good Hope↩ were motivated solely by his desire to reduce his interest expenses.
25. It is also noteworthy that Mr. Briggs attempted to earn additional income from the Good Hope when circumstances beyond his control prevented him from using that vessel for fishing. Thus, when Mr. Briggs realized that his fishing activities in 1989 would be stymied as a result of the Valdez oil spill, he chartered the Good Hope to VECO which was involved in assisting in the cleanup. In 1993, Mr. Briggs positioned himself to earn money by leasing the Good Hope in the event of any future oil spills when he executed a charter agreement with Alyeska. Under that agreement, the Good Hope will be chartered to Alyeska to assist in the cleanup of any future oil spills that would make it difficult for Mr. Briggs to fish. The Alyeska agreement further provides that Mr. Briggs is to be compensated when the Good Hope↩ is used by Alyeska in boat training activities.
26. One of those trips, a trip of five days, took place during a period in which there also was a halibut opening.↩
27. One of those trips, a trip of three days, took place during a period in which there also was a halibut opening.↩
28. One of those trips, a trip of seven days, took place during a period in which there also was a halibut opening.↩
29. We reach this conclusion based on facts in the record which reveal that (1) for each fishing trip during the years at issue, Mr. Briggs generally placed approximately 50 to 60 tubs aboard the Good Hope↩, (2) each tub contained a single skate, and (3) after each fishing trip during the years at issue, Mr. Briggs and Ms. Person spent approximately one and a half to three hours per skate in preparing Mr. Briggs' skates for subsequent fishing trips.
30. We also note that, in addition to the jigging equipment, other items are listed in the 1993 valuation report that are not listed in the 1990 valuation report, namely, a 24-volt D.C. system used in operating the jigging machines, a stern bait shed, and two pieces of safety equipment located on the Good Hope↩'s flying bridge. The record does not disclose the cost of those items.
31. We also note that, as of the trial of these cases, additional gear not attached to the Good Hope, including tub gear, anchor lines, and anchors, had a replacement value or cost of between $ 20,000 and $ 25,000 and that other equipment not attached to the Good Hope↩ but used by Mr. Briggs in his commercial fishing activity had a replacement value or cost of approximately $ 5,000 to $ 10,000. That gear and equipment appear to us to be valuable assets used by Mr. Briggs in his commercial fishing operation.
32. Neither party disputes the use of these estimates to value the quotas Mr. Briggs is to receive.↩
33. Neither of these averages reflects Mr. Briggs' receipt of $ 60,000 in 1989 from his charter of the Good Hope↩ to VECO.
34. Mr. Briggs testified that the fishing activity was profitable for 1989. Nonetheless, in his tax return for that year, Mr. Briggs reported a loss from that activity in the amount of $ 1,880.↩
35. Mr. Briggs' reported net losses relating to his fishing activity peaked in 1984, the first full year that he used the Good Hope↩ in that activity. Following this peak net loss, Mr. Briggs' reported net losses from his fishing activity steadily dropped to $ 1,880 for the year 1989. For the year 1990, his reported net loss increased to $ 46,444. In that year, however, Mr. Briggs' fishing activity was interrupted by his medical problems.
36. The existence of other income against which any deductions from the activity are usable merely poses the question, rather than answers it. As we stated in Engdahl v. Commissioner, 72 T.C. 659, 670 (1979): If there is no other income, there is no issue. As long as tax rates are less than 100 percent, there is no "benefit" in losing money. * * * The essential question remains as to whether there was a genuine hope of economic profit. * * *↩
37. Our decision regarding Mr. Briggs' profit objective resolves issues relating to petitioners' deduction of claimed net operating loss carryovers and investment tax credit carryovers.↩
38. The parties stipulated that Mr. Briggs' electrical contracting activity generated no gross receipts for 1988.↩
39. We note that Ms. Person did testify that she had operated profitable teaching and fishing activities in the past. We also found that in the past Mr. Briggs successfully supported himself as an independent contractor. Nevertheless, that testimony and that finding are not sufficient for us to conclude that either Ms. Person's teaching and fishing activities or Mr. Briggs' electrical contracting activity were conducted during the years at issue with a bona fide profit objective.↩