T.C. Memo. 1999-397


UNITED STATES TAX COURT


MICHAEL A. OGDEN, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MICHAEL A. AND COLLEEN OGDEN, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5084-98, 5085-98.    Filed December 7, 1999.

Kenneth K. Bezozo and Richard D. Anigian, for petitioners.

Stephen W. Brower, for respondent.


MEMORANDUM OPINION

PAJAK, Special Trial Judge:  Respondent determined deficiencies and accuracy-related penalties in petitioners' Federal income tax in the following amounts:

Michael A. Ogden:

| Year | Deficiency | Accuracy-related Penalty sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1993 | $3,791 | $758 |

Michael A. Ogden and Colleen R. Ogden:

| Year | Deficiency | Accuracy-related Penalty sec. 6662(a) |
|------|-----------|----------------------------------------|
| 1994 | $5,533 | $1,107 |
| 1995 | $6,131 | $1,226 |

Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the years in issue.

In the notices of deficiency, respondent disallowed petitioners' deductions for Schedule C expenses incurred in connection with their Amway distributorship on the grounds that petitioners did not engage in their Amway activity for the purpose of making a profit. The only two issues for this Court to decide are: (1) Whether petitioners were not engaged in their Amway activity for profit within the meaning of section 183 and (2) whether petitioners are liable for the section 6662 accuracy-related penalties for negligence.

Some of the facts in this case have been stipulated and are so found. For convenience and clarity, the findings of fact and opinion are combined. Petitioners resided in Pearland, Texas, at the time they filed their petitions.

In 1992, petitioner Michael Ogden (Mr. Ogden) became a distributor for Amway. In 1993, petitioner Colleen Ogden (Mrs. Ogden), while single, joined Mr. Ogden as a distributor. Mr. and Mrs. Ogden were married in 1994. Their daughter, Casie Nicole, was born in September 1995.

Amway is a supplier of various household products that are sold by distributors through direct marketing. Distributors purchase the products for personal use, as well as for resale to customers and downline distributors. Distributors are encouraged to recruit others to become downline distributors. The Amway system is based on an upline-downline system whereby a distributor's direct and indirect sales are rewarded with bonuses. In addition to a percentage of his own sales volume, an Amway distributor may earn income by recruiting others to join Amway as distributors. The original Amway distributor is called an "upline" distributor in relation to his new recruit, the "downline" distributor. The upline distributor receives a percentage of the sales achieved by the downline distributors in his "chain of distribution" even though the upliner does not participate in their sales. If a downline distributor recruits another individual to be his downline distributor, the upline distributor takes a percentage of the sales of both downline distributors, even though the upliner has nothing to do with the activities of the new downline distributor. Thus, to maximize Amway-related income, the distributor sells the Amway products and tries to enlist others as downline distributors.

Amway does not have a quota for sales, its products do not have to be sold above cost, and its distributors are not required to sponsor downline distributors. An Amway brochure, The Amway

Business Review, states that the potential for earning income increases as the number of distributors in a sponsor's group grows and as sales increase.  Distributors devote as little or as much of their time to Amway activities as they desire.  The eight page Amway Business Review in large blocks on four of its pages highlights the fact that "The Average Monthly Gross Income for 'Active' Distributors was $88."

Mr. Ogden obtained a Certificate of Operation under Assumed Name for Ogden Enterprises.  Mr. Ogden claims that Ogden Enterprises is engaged in the business of selling Amway products. On line B of Schedule C of each return for the years in issue for Ogden Enterprises, under "principal business code", Mr. Ogden and then Mr. and Mrs. Ogden listed "3012", which number represents "Selling door to door, by telephone or party plan, or from mobile unit".  On their Federal income tax returns for the years in issue, Mr. Ogden and Mrs. Ogden did not disclose that either of them or Ogden Enterprises was engaged in an Amway activity.  On all three of these returns, line A of Schedule C, "Principal business or profession, including product or service", contained the words "PRODUCT DISTRIBUTION."

Mr. Ogden testified that 10 to 15 percent of the sales were to non-distributor end-users who were not trying to build an Amway distributorship.  Petitioners have focused their efforts on recruiting downliners in this multilevel marketing process. Because of their efforts, Mr. Ogden personally sponsored 17

downline distributors.  In addition, many of his downliners had their own downliners.

Mr. Ogden or petitioners reported gross income of $1,082, $2,041, and $5,290 in 1993, 1994, and 1995, respectively.  The principal categories of deductions claimed on the Schedule C for 1993, 1994, and 1995 are set forth below.  Mr. Ogden or petitioners claimed deductions for car and truck expenses of $9,613, $11,488, and $12,130, respectively.  They also claimed deductions for travel, meals, and entertainment of $4,931, $4,153, and $2,242, respectively.  Mr. Ogden or petitioners deducted total expenses on the Schedules C of $21,322, $21,693 and $24,982 during 1993, 1994, and 1995, respectively.  As stated, respondent determined that these deductions should be disallowed because petitioners did not have the requisite profit objective under section 183.

Section 183(a) disallows any deductions attributable to activities not engaged in for profit except as provided under section 183(b).  Taxpayers need not have a reasonable expectation of profit.  However, the facts and circumstances must demonstrate that they entered into the activity, or continued the activity, with the actual and honest objective of making a profit.  Taube v. Commissioner, 88 T.C. 464, 478 (1987); Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); sec. 1.183-2(a), Income Tax Regs. The taxpayer's motive to make a profit must be analyzed by

- 6 -

looking at all the surrounding objective facts.  Dreicer v. Commissioner, supra at 645.  These facts are given greater weight than petitioners' mere statement of intent.  Dreicer v. Commissioner, supra.

Section 1.183-2(b), Income Tax Regs., provides a nonexclusive list of relevant factors which should be considered in determining whether the taxpayer has the requisite profit objective.  The factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) any elements indicating personal pleasure or recreation.  Sec. 1.183-2(b), Income Tax Regs.  These factors are not applicable or appropriate in every case.  Abramson v. Commissioner, 86 T.C. 360, 371 (1986).

In determining whether petitioners were engaged in the Amway distributorship with the requisite intent to make a profit, all of the facts and circumstances of their situation must be taken into account.  Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981);

- 7 -

sec. 1.183-2(a) and (b), Income Tax Regs.  No single factor is controlling, nor is the existence of a majority of factors favoring or disfavoring a profit objective necessarily controlling.  Hendricks v. Commissioner, 32 F.3d 94, 98 (4th Cir. 1994), affg. T.C. Memo. 1993-396; sec. 1.183-2(b), Income Tax Regs.

The parties stipulated that the following documents were made available to respondent:

A Franklin Planner detailing (i) all the times the Ogdens showed the Amway Sales and Marketing Plan, the travel related thereto and expenses associated therewith; (ii) records of phone calls relating to Petitioners' Amway enterprise; (iii) meetings with "upline" and "downline" sponsors and prospects; and (iv) extensive notes taken at Amway meetings and functions; detailed records of all Amway products ordered through the Ogden's Amway organization; all receipts for meals, travel, training and seminars, and other expenses related thereto; detailed business telephone and voicemail charges; detailed cellular phone charges; commercial bank account records for Ogden Enterprises; detailed long distance phone records; detailed pager expenses for 1995; and detailed postage expenses records.

We found it difficult to analyze or date some of the documents placed in evidence because many of them were photocopies of handwritten papers.  Petitioners did not maintain a budget in an attempt to reduce costs.  We were not impressed with their handwritten, scribbled so-called projections.

Petitioners apparently followed the generalized business plan published by Amway.  Petitioners tried different marketing techniques, such as fliers and telemarketing, to increase their retail sales.  Although petitioners' gross income from Amway

increased annually, the claimed deductions were more than sufficient to offset the gross income.

We next consider the expertise of the petitioners or their advisers. Sec. 1.183-2(b)(2), Income Tax Regs. Mr. Ogden managed several employees and a $300,000 budget in his own full-time work as a civil engineer. In 3 years, he doubled his original staff of 8 employees. Mrs. Ogden has a bachelor's degree in business administration and previously had retail experience managing stores for Eckerd Drugs and Reebok. Some of her past duties included hiring and training employees, inventory control, payroll, merchandising, and sales analysis. In 1993, Mrs. Ogden received a certification in paralegal studies. She was certified as a child advocate by a family court.

Before choosing Amway, Mr. Ogden investigated various franchises. He spoke to his father, Amway distributors, and his C.P.A. about the details of an Amway distributorship. We question the value of the C.P.A.'s advice. We believe Amway distributors may be biased when discussing Amway because they have a natural desire to advance the organization and/or obtain income from a downliner.

Another factor to consider is the time and effort expended by petitioners in carrying on the Amway distributorship. Sec. 1.183-2(b)(3), Income Tax Regs. Petitioners alleged that they worked evenings, lunch, and weekends in connection with their Amway activities. Mr. Ogden claimed he worked on Amway

activities an average of 25 hours per week, while Mrs. Ogden alleged she worked between 10-15 hours per week. It is difficult to believe Mr. Ogden worked 25 hours per week while he traveled to and maintained a full-time job with significant and expanding responsibilities. We are not required to accept the self-serving testimony of either petitioner as gospel. <u>Tokarski v. Commissioner</u>, 87 T.C. 74, 77 (1986).

Mrs. Ogden claimed she spent 2 hours one day a week waiting for telephone orders on what she characterized as a weekly call-in sheet. The weekly call-in sheet for her five personal downliners is revealing in that it listed only 50 miscellaneous household products. Most of the items on the list were for one item. A sample of these items are: One crisp rice, 13 ounces; one marinara pasta sauce, 25 ounces; one meatless ravioli, 9 ounces; one trash bags, 13 gallons; and one bar soap, 3.25 ounces. According to Mrs. Ogden's testimony, several days after she prepared the call-in sheet, she drove to her upline distributor to pick up those products at 11:00 p.m. and did not get home until 2 or 3 a.m. Mrs. Ogden claimed that it could "take anywhere from an hour to an hour-and-a-half just to check-off all the products and make sure everything is there and put it in -pack it in your car- and then drive home, another 45 minutes." The following day, downliners came to her house from 6:30 a.m. to 8:30 a.m. to pick up their products. Her testimony lacks credibility.

The parties stipulated that petitioners' records indicate that they drove more than 30,000 miles per year in connection with their Amway activities. The parties stipulated that petitioners' records indicate that they have shown the Amway plan, for about 2 hours per showing, approximately 137 times in 1993, approximately 200 times in 1994, and approximately 104 times in 1995, to recruit potential Amway distributors. The Court was not persuaded that these records were accurate. We agree with respondent that petitioners spent most of their time recruiting downline distributors rather than selling products.

The expectation that assets used in the Amway distributorship may appreciate in value is not relevant. Sec. 1.183-2(b)(4), Income Tax Regs. The success of petitioners in carrying out other similar or dissimilar activities has been addressed. Sec. 1.183-2(b)(5), Income Tax Regs.

Petitioners' history of income or losses with respect to the Amway distributorship is revealing. Sec. 1.183-2(b)(6), Income Tax Regs. Most of petitioners' gross income comes from the bonuses provided by Amway. As noted, petitioners did not list Amway on the Federal Income Tax returns. In fact, petitioners' C.P.A. and petitioners failed to list their gross sales and their cost of goods sold on their Federal returns, contrary to the format of the Schedules C. Mr. Ogden testified that he did not know why the gross sales were omitted from the 1993, 1994, and 1995 returns and that he did not learn of this omission until 3

weeks before trial.  If petitioners had accurate books and records and reviewed the returns before signing them under penalties of perjury, he, and then he and his wife, would have had to discover such gross omissions.

The parties stipulated that petitioners realized gross sales income of $43,575 in 1993, $66,276 in 1994, and $76,526 in 1995.  Although Mr. Ogden and then petitioners did not report these gross sales on their  returns, they did report them to Amway for bonus purposes.  After reducing the gross sales income by the cost of the goods sold, the gross income of Mr. Ogden and then petitioners was $1,082 in 1993, $2,041 in 1994, and $5,290 in 1995.  The net losses of Mr. Ogden and then petitioners were $20,250 in 1993, $19,652 in 1994, and $19,692 in 1995.

A series of losses during the initial stage of an activity is not necessarily an indication that petitioners are not engaged in the activity for profit.  Sec. 1.183-2(b)(6), Income Tax Regs. However, if such losses continue beyond the period in which it is customary for an activity to become profitable, then the losses, if they are unexplainable, may be indicative of a lack of intent to profit.  Id.  A series of years in which net income was realized would be strong evidence that the activity is for profit.  Id.  Petitioners had no such years in which net income was realized.

When we consider the financial status of the taxpayer, section 1.183-2(b)(8), Income Tax Regs, we find that petitioners'

main source of income was from their employment as an engineer and a paralegal. The relevant income was $31,381 in 1993, $64,642 in 1994, and $64,462 in 1995. Mr. Ogden and then petitioners obviously benefited from the significant deductions they took as a result of the losses from their Amway activities. These losses amounted to about 64 percent of income in 1993 and about 30 percent of income in 1994 and 1995.

Another element is the personal pleasure or recreation involved in the activity. Sec. 1.183-2(b)(9), Income Tax Regs. Petitioners testified that they purchased $1,800 to $2,400 worth of products per year for their personal use. Thus, they purchased a substantial amount of household goods at a discount. Cf. Theisen v. Commissioner, T.C. Memo. 1997-539. They claim their travel is usually limited to day trips that consist of meetings or showing the Amway plan, often at the house of new recruits. Petitioners assert they find no pleasure in this type of travel. They also stated that to reduce expenses they shared a hotel room for a particular function in 1993 with 15 other people.

Upon review of the entire record, we believe Mr. Ogden and then Mr. and Mrs. Ogden did not have an actual and honest objective of making a profit in the Amway activity during the years in issue. It was obvious that Mr. Ogden's Amway endeavors were a substantial economic loss and tax loss for 1993. The large volume of losses, which he used to offset about 64 percent

of his income from other sources on his return for 1993, would have put an ordinary prudent taxpayer on notice that this activity was unlikely to produce a profit.

The Ogdens carefully avoided any reference to Amway on the Schedules C. For instance, in 1993, Mr. Ogden neglected to report gross sales of $43,575 and cost of goods sold of $42,493 resulting in gross income of $1,082. He reported the gross income of $1,082 and a net loss of $20,250, after deducting $21,332 in expenses. It appears clear that Mr. Ogden should have realized that his golden opportunity was not golden and that he would not make a profit. Mr. Ogden and then his wife continued to suffer substantial losses for at least the next 4 years after 1993. We find that petitioners' involvement with Amway enabled petitioners to purchase household goods at cost and to take substantial deductions to offset their wage income, not to make a profit. We sustain respondent's determination as to the deficiencies for all 3 years in issue.

Section 6662(a) provides for an accuracy-related penalty in the amount of 20 percent of the portion of an underpayment of tax attributable to, among other things, negligence or disregard of rules or regulations. Sec. 6662(a) and (b)(1). Negligence is defined to include any failure to make a reasonable attempt to comply with the provisions of the Internal Revenue laws. Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs. Moreover, negligence is the failure to exercise due care or the failure to

do what a reasonable and prudent person would do under the circumstances. <u>Neely v. Commissioner</u>, 85 T.C. 934, 947 (1985). Disregard is defined to include any careless, reckless, or intentional disregard of rules or regulations. Sec. 6662(c); sec. 1.6662-3(b)(2), Income Tax Regs.

Upon review of the facts and circumstances of this case, we find that petitioners are well-educated individuals with professional backgrounds. They entered into an Amway endeavor even though the Amway Business Review highlighted the fact that the average gross income for active distributors was $88. Petitioners consistently hid the fact that their losses were from an Amway entity. They continued this endeavor even though the result was years of substantial tax losses and years of substantial tax deductions. We were not satisfied with their purported record keeping or their testimony. We do not believe the aforesaid actions are the actions of reasonable and prudent persons. We sustain the section 6662(a) accuracy-related penalties for all 3 years in question.

<u>Decisions will be entered for respondent.</u>